[No. S004730. Crim. No. 25937. Oct. 22, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT WAYNE DANIELSON, Defendant and Appellant.

## COUNSEL

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Philip M. Brooks, Bruce E. Cohen and Victor J. Morse, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, John H. Sugiyama and Ronald A. Bass, Assistant Attorneys General, Dane R. Gillette and David Lew, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LUCAS, C. J.—

### I.

### INTRODUCTION

By amended information filed in Mendocino County Superior Court, defendant Robert Wayne Danielson was charged with the burglary, robbery,

kidnapping and murder of an elderly couple, Benjamin and Edith Shaffer. The information alleged both murders were in the first degree, based on alternative theories of felony-murder-robbery (Pen. Code, §§ 189, 211; all further statutory references are to this code unless otherwise indicated), and willful, premeditated murder (§ 189), as to each victim. The information further alleged three special circumstances: felony-murder-robbery (§ 190.2, subd. (a)(17)(i)), felony-murder-kidnapping (*id.*, subd. (a)(17)(ii)), and multiple murder (*id.*, subd. (a)(3)).

The jury found defendant guilty on all counts, determining the murders to be of the first degree, and finding true the special circumstance allegations. The jury subsequently returned a death verdict, and the trial court sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).)

As will appear, we reject defendant's claims of prejudicial error and affirm the judgment in its entirety. (Defendant previously had filed with us a petition for habeas corpus, alleging incompetence of his trial counsel. In November 1991, we denied the petition without issuing an order to show cause.)

II.

FACTS

The guilt phase evidence established that in the summer of 1982, defendant and his girlfriend, Lanora Johnson, hitchhiked from Oregon to a trailer park in Mendocino County, California. Lacking funds, the two discussed robbing and killing someone. They chose as their victims an elderly couple, Mr. and Mrs. Shaffer, with whom they had earlier conversed. One morning in July 1982, Johnson and defendant (who displayed and pointed a handgun) forced their way into the Shaffer camper, which was parked nearby. While Johnson stood guard over the Shaffers in the camper, defendant drove their adjoining truck to a wooded area. At defendant's direction, Johnson tied up the Shaffers, and then left the area to walk the Shaffers' dog.

While walking the dog, Johnson heard several gunshots. She returned to the camper and found that both Mr. and Mrs. Shaffer had been shot in the head and were lying on the ground. Defendant told Johnson he had to shoot Mrs. Shaffer twice in order to kill her. After defendant disposed of the bodies by rolling them down an embankment, the couple ransacked the Shaffers' camper, removing their travelers checks, credit cards, and other property.

Thereafter, defendant and Johnson drove to Nevada in the Shaffers' camper, using their credit cards and travelers checks for various purchases

along the way. On one occasion in Nevada, defendant admitted to an acquaintance, Terry Brown, that he had shot and killed the Shaffers. For nearly two years, the disappearance of the Shaffers remained unsolved and their bodies went undiscovered. In early 1984, Johnson implicated defendant in the crimes and led police officers to the murder scene, where the Shaffers' remains were discovered. In April 1984, defendant was arrested in Odessa, Texas. He was ultimately charged with the present offenses in Mendocino County Superior Court.

The primary guilt phase evidence was the testimony of Johnson, who had been granted immunity from prosecution. Her testimony was corroborated by circumstantial evidence linking defendant to the murders, and by the testimony of Terry Brown, an associate of defendants, who claimed that defendant made a detailed confession of the Shaffer murders. The defense focused primarily on attempting to impeach or contradict the incriminating testimony of Johnson and Brown.

At the penalty phase, the People introduced defendant's record of prior felony convictions for drug possession, firearm possession, voluntary manslaughter, and forgery. In addition, the People introduced evidence of defendant's unadjudicated prior violent acts, including a robbery-murder, and a robbery-attempted murder. The defense at the penalty phase consisted of testimony from defendant and others describing his troubled childhood, prison experiences, drug use and depression, good conduct in jail, and remorse for his crimes. Defendant read a statement to the jury explaining his conversion to Christianity, the extent of his remorse, and his hope the jury would render a "fair judgment."

### III.

### GUILT AND SPECIAL CIRCUMSTANCES ISSUES

#### A. *Granting Hardship Excuses*

 Defendant contends his federal and state constitutional rights to a jury drawn from the vicinage were violated by the trial court's policy of excusing all prospective jurors claiming hardship caused by residing more than an hour and a half from the Mendocino County courthouse in Ukiah. (See Cal. Stds. Jud. Admin., § 4.5(d)(2).) In defendant's view, he was entitled to jurors from the "immediate vicinity of the crime scene." We reject defendant's argument.

First, as the People observe, defendant made no vicinage challenge to his jury; his only objection to the court's excusal rulings was that they prevented

"getting jurors from all over the county," an objection which failed to invoke defendant's present "crime scene"/vicinage argument. (See former § 1060.)

In any event, defendant was not denied his vicinage right. The Sixth Amendment of the United States Constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . ." Included in this constitutional guarantee is the right to a trial by a jury residing in the vicinage, applicable in state courts through the Fourteenth Amendment. (See *Williams* v. *Florida* (1970) 399 U.S. 78, 96 [26 L.Ed.2d 446, 457-458, 90 S.Ct. 1893]; *Hernandez* v. *Municipal Court* (1989) 49 Cal.3d 713, 721-724 [263 Cal.Rptr. 513, 781 P.2d 547] [*Hernandez*].)

We have held, however, that for purposes of Sixth Amendment challenges to prosecutions in California courts, "the boundaries of the vicinage are coterminous with the boundaries of the county." (*Hernandez, supra,* 49 Cal.3d at p. 729, fn. omitted.) Thus, our decision in *Hernandez* is dispositive of defendant's federal constitutional claim, for he does not assert that the jurors in his case were drawn from outside the *county* wherein the murders were committed.

Defendant contends that ex post facto or due process principles would preclude application of *Hernandez* to his case, which was tried before *Hernandez* was decided. Had defendant raised a vicinage challenge at time of trial, based on pre-*Hernandez* law, the foregoing issue would be squarely raised. But as we have seen, no such challenge was presented.

Defendant also asserts a violation of his right under the state Constitution to a jury drawn from the vicinage. ■ Although the California Constitution does not contain an explicit vicinage requirement, it nonetheless does provide an independent guarantee of the right to a jury drawn from the vicinage. (See *Hernandez, supra,* 49 Cal.3d at p. 721; *People* v. *Guzman* (1988) 45 Cal.3d 915, 935 [248 Cal.Rptr. 467, 755 P.2d 917]; *People* v. *Powell* (1891) 87 Cal. 348 [25 P. 481].) ■ However, for purposes of state constitutional challenges to the proper selection of jurors in criminal trials in state courts, the boundaries of the vicinage are also coterminous with the boundaries of the county. (*People* v. *Powell, supra,* 87 Cal. at pp. 354-357.) Thus, our decision in *Powell* is dispositive of defendant's state constitutional claim.

We note defendant has asked that we take judicial notice of the contents of a standard map of Mendocino County. Although such a countywide map is a

proper subject of judicial notice (Evid. Code §§ 452, subd. (h), 459, subd. (a)), this evidence is unnecessary in light of our conclusion that vicinage covers the entire county.

### B. *Denial of Continuance*

 Defendant contends the trial court abused its discretion in denying a requested three-day continuance to establish the underrepresentation of various minority groups on the panel of prospective jurors. The request for continuance was made near the completion of the jury selection process and was denied on the ground defendant failed to use reasonable diligence in marshalling the evidence supporting the motion. We find no abuse of discretion.

The gist of defendant's claim was that Blacks and Hispanics (among other identified groups) were potentially underrepresented by reason of the trial court's liberal hardship excusal policy, and that a continuance was needed to allow defendant's expert, Dr. Bronson, additional time to evaluate the statistical data extracted from the jury questionnaires. Dr. Bronson opined in his declaration that although he could not confidently assert that any unconstitutional underrepresentation occurred, the "limited data I have examined does tend to support that conclusion." Dr. Bronson observed that although only 51 percent of White venirepersons he had examined thus far had been excused, 75 percent of "minority" venirepersons had been excused.

The trial court, noting that defendant had access to the jury questionnaires for three weeks prior to the motion, denied the continuance request as untimely. Defendant now asserts the trial court erred because "no meaningful analysis of the data was feasible until the voir dire process had nearly run its course," and prospective jurors were either excused or accepted. As defendant observes, examination of the questionnaires alone could not resolve the question whether the court was exercising improper criteria in excusing prospective jurors, and whether such criteria produced a jury unrepresentative of the community.

 The People respond by citing the well-settled rule that the trial courts possess broad discretion to grant or deny continuances, and the defendant must show he exercised due diligence in preparing for trial. (*People* v. *Grant* (1988) 45 Cal.3d 829, 844 [248 Cal.Rptr. 444, 755 P.2d 894].) Here, the record indicates that defendant failed to deliver the jury questionnaires to Dr. Bronson until one day prior to the hearing on defendant's motion to quash the panel. These questionnaires would have disclosed the racial background of each responding juror and, combined with the court's excusal

practices to that point, possibly could have afforded some support for defendant's motion to quash.

We conclude the trial court did not abuse its discretion in denying defendant's continuance request as untimely. Assuming for purposes of argument that the request was timely, it seems clear any such error was harmless. At most, a continuance might have allowed defendant's expert to present statistical evidence that the court's allegedly liberal hardship excusal practices may have resulted in excluding a disproportionate number of Blacks and Hispanics. But defendant failed, and continues to fail, to set forth any basis for concluding that such underrepresentation resulted from some *improper* feature of the court's excusal practices.

Statistical underrepresentation of minority groups resulting from race-neutral excusal practices does not amount to "systematic exclusion" necessary to support a representative cross-section claim. (See *People* v. *Howard* (1992) 1 Cal.4th 1132, 1160 [5 Cal.Rptr.2d 268, 824 P.2d 1315], *People* v. *Sanders* (1990) 51 Cal.3d 471, 492-493 [273 Cal.Rptr. 537, 797 P.2d 561]; *People* v. *Bell* (1989) 49 Cal.3d 502, 524 [262 Cal.Rptr. 1, 778 P.2d 129]; *People* v. *Morales* (1989) 48 Cal.3d 527, 546 [257 Cal.Rptr. 64, 770 P.2d 244].)

■ As we stated in *Sanders, supra,* 51 Cal.3d at pages 492-493, "By basing his motion to quash on the expert statistical evidence . . . , defendant sought to show a statistical disparity occurred over time and was thus the result of a 'systematic exclusion' of Hispanics. As we recently explained in *Bell, supra,* however, such a showing is insufficient, standing alone, to make out a prima facie case of a Sixth Amendment violation. When, as here, 'a county's jury selection criteria are neutral with respect to race, ethnicity, sex, and religion, more is required to shift the burden to the People. The defendant must identify some aspect of the manner in which those criteria are being applied that is: (1) the probable cause of the disparity, and (2) constitutionally impermissible.' (*Bell, supra,* 49 Cal.3d at p. 524.) Evidence that 'race/class *neutral* jury selection processes may nonetheless operate to permit the de facto exclusion of a higher percentage of a particular class of jurors than would result from a random draw' is insufficient to make out a prima facie case. (*Morales, supra,* 48 Cal.3d at p. 546, italics in original.)"

■ In the absence of any evidence that the trial court's excusal policies were *improperly* applied in a more lenient manner on behalf of minority venirepersons, defendant's motion to quash lacked merit. Accordingly, the court properly denied a continuance to pursue the motion on this basis. No suggestion is made that a continuance would have developed such evidence.

C. *Motion to Suppress Evidence*

Defendant contends the warrantless seizure by federal authorities of his property from an open storage trailer violated his rights under the Fourth Amendment, and that the trial court erred in failing to suppress the items seized.

The following facts were elicited at the pretrial hearing on defendant's motion to suppress under section 1538.5: On April 5, 1984, defendant and his girlfriend of six months, Londa Lynn, were arrested in a carnival trailer in Odessa, Texas. The following day, Federal Bureau of Investigation (FBI) Agent Billy Kirkwood obtained the release of Lynn, and accompanied her to the carnival grounds. Lynn took Kirkwood to a second trailer in which carnival employees stored many of their personal belongings. As a carnival employee, Lynn had access to the open storage trailer. Lynn entered the storage trailer alone and retrieved her belongings as well as those of defendant. Lynn handed Kirkwood defendant's property and indicated to him that she planned to return home to Tennessee without further contact with defendant. According to Kirkwood, he accepted custody of defendant's property for safekeeping purposes only, rather than to search for evidence. He testified that he was informed the carnival was leaving town on the day of the seizure, and that he did not examine the property before sending it to the FBI office in Eugene, Oregon.

Among the items seized was a green duffel bag, with "888" or "BBB" printed in black ink on the exterior. When the printing was magnified and examined under fluorescent lights, investigators found victim Benjamin Shaffer's initials, "BFS," in red ink beneath the black printing. At trial, the duffel bag was identified as belonging to Shaffer.

Defendant moved to suppress the foregoing evidence, arguing that no exigent circumstances existed to justify a warrantless seizure of his property, and noting that the officer failed to ask him where he wanted his belongings to be stored. The trial court denied the motion to suppress, ruling that Lynn had the authority to enter the trailer and deliver defendant's belongings to the officers. The court further held the seizure was proper to safeguard defendant's property and secure it as possible evidence.

On appeal, the People suggest the seizure was proper for a variety of reasons, including (1) Lynn's consent thereto, (2) the need to safeguard defendant's property, and (3) defendant's lack of standing to complain. Defendant contends that the seizure cannot be upheld on any of the foregoing theories.

First, the People failed to raise the *third party consent* theory below, and therefore defendant had no occasion to attempt to rebut it with evidence or argument showing Lynn's consent was legally insufficient. (See *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640 [108 Cal.Rptr. 585, 511 P.2d 33].) Although some evidence was elicited on the issue, it does not appear the issue was as fully developed as it would have been had the People formally pressed a consent theory. Additionally, on this record it is uncertain whether Lynn, as defendant's girlfriend, had authority to consent to such a seizure.

Second, although the issue of *safekeeping* was indeed litigated, forming a basis for the trial court's denial of defendant's suppression motion, it is questionable whether we would sustain that ruling on appeal. The record indicates that although the seizing officer indicated the property would be held for safekeeping, it was not inventoried at the police station but was merely shipped to the FBI agency in Oregon. Cases sustaining inventory or safekeeping seizures generally require some kind of standardized or established inventory procedure apparently lacking in this case. (See *Florida* v. *Wells* (1990) 495 U.S. 1, 5-7 [109 L.Ed.2d 1, 7-8, 110 S.Ct. 1632]; *Illinois* v. *LaFayette* (1983) 462 U.S. 640, 646-648 [77 L.Ed.2d 65, 71-72, 103 S.Ct. 2605].) Additionally, although some exigency existed because the carnival was being moved on the day of the seizure, the People failed to show that a warrant could not have been obtained before that time. (*United States* v. *Howard* (9th Cir. 1987) 828 F.2d 552, 555.)

Third, although the People did assert defendant's *lack of standing* to object to the seizure, the trial court overruled the objection before defendant had attempted to elicit evidence and argument on the subject. According to defendant, it would be unfair to resolve the issue on appeal in light of the incomplete record resulting from the trial court's ruling that defendant had standing. Defendant, however, fails to suggest what evidence could have been offered to demonstrate his standing to object to the seizure of property belonging to, and stolen from, the victim in this case. (See *Rakas* v. *Illinois* (1978) 439 U.S. 128, 134 [58 L.Ed.2d 387, 394-395, 99 S.Ct. 421]; *In re Lance W.* (1985) 37 Cal.3d 873, 885-890 [210 Cal.Rptr. 631, 694 P.2d 744].) It is simply inconceivable that defendant could have established a basis for claiming a legitimate possessory interest in the Shaffer duffel bag.

In any event, any improper admission of the evidence in question was harmless beyond a reasonable doubt in light of all the other evidence presented at trial. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].) As previously indicated, defendant's accomplice, Lanora Johnson, testified in detail regarding

his central role in the Shaffer murders. Her testimony was itself strongly corroborated by Terry Brown, a former friend of defendant. According to Brown, after a day of drinking, he went to a bar in South Lake Tahoe where he drank beer and met defendant whom he had invited to join him. Defendant admitted to Brown during this meeting that he had killed two people named Shaffer, and described the shootings in detail. The defense attempted to impeach Brown by establishing that he related his statement to the police only after he had been arrested for armed robbery. Brown denied, however, that he gave his statement or subsequent testimony in the hope of receiving a more lenient sentence. According to Brown, whose testimony was not contradicted by defendant in this regard, Brown had already negotiated a five-year prison sentence when he volunteered information regarding defendant's statement, and no further leniency was granted to him.

In addition, circumstantial evidence (other than the green duffel bag at issue) tied defendant to the Shaffer murders, including a close ballistic match of a gun at one time owned by defendant with the bullets recovered from the crime scene. There was also considerable evidence suggesting that defendant attempted to forge the Shaffers' names on various credit card transaction slips and traveler's checks, although the People's handwriting expert could not conclusively state that defendant had signed these items.

In light of the entire record, we conclude that any error in admitting evidence of Benjamin Shaffer's duffel bag was harmless beyond a reasonable doubt.

D. *Prosecutor's Argument Concerning Immunity Agreement With Lanora Johnson*

█ Defendant contends the prosecutor in his closing arguments misstated the legal effect of the immunity agreement with Lanora Johnson. The agreement required Johnson to testify fully regarding her knowledge of defendant's involvement in the charged offenses. The agreement immunized Johnson from prosecution based on her answers or evidence arising therefrom, but provided that she could be prosecuted for any perjury or contempt in answering or failing to answer the prosecutor's questions.

Defense counsel attempted to impeach Johnson's testimony by stressing her motivation to assist the People, and assure immunity from prosecution, by implicating defendant. In response, in closing arguments, the prosecutor stressed that (1) Johnson accepted the immunity agreement prior to her initial testimony before the grand jury; (2) under the agreement, Johnson "could have simply said . . . the defendant is not the one [who committed

the offenses]," and thereafter could have "walked out of here a free person"; and (3) Johnson had a "free reign [*sic*] if she wanted to let him completely off the hook."

Defense counsel objected to the foregoing argument, observing that if Johnson had tried to retract her earlier statements implicating defendant, the prosecutor undoubtedly would have rescinded the immunity agreement. The court overruled the objection.

As previously indicated, defendant contends the prosecutor's argument was legally incorrect and tended to undermine the defense theory that Johnson was testifying against defendant under the compulsion or strong incentive of an immunity agreement. Defendant observes that Johnson could not simply "walk away" after exonerating defendant, because any such attempt would be wholly inconsistent with her prior statements implicating him, and she would undoubtedly be charged with perjury and risk losing immunity. Although defendant does not challenge the validity of the immunity agreement itself (see, e.g., *People* v. *Garrison* (1989) 47 Cal.3d 746, 768-771 [254 Cal.Rptr. 257, 765 P.2d 419]), he suggests the prosecutor's argument "defeated" his right to confront and cross-examine Johnson.

In our view, defendant reads too much into the prosecutor's remarks. Viewed in context, the prosecutor was simply noting that the agreement did not compel Johnson to testify against defendant but merely required her to tell the truth, whether or not favorable to defendant, and that she would not lose her immunity if she *truthfully* exonerated defendant. As the prosecutor stated, "she could have said that *if that was the case*." (Italics added.) Although it is possible a juror might have misinterpreted the prosecutor's remarks, we find no reasonable likelihood such confusion occurred. (See *People* v. *Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) Defendant previously had full opportunity to explore, in cross-examination or argument, the precise nature of the immunity agreement and Johnson's obligations and motivations thereunder.

E. *Failure to Provide Jury With Written Instructions*

■ Defendant argues the court erred in failing to provide the jury with written instructions at both the guilt and penalty phases, thereby denying defendant his right under the state and federal Constitutions to due process, an informed jury, and a reliable determination of guilt and penalty. We discuss the penalty phase issue in a subsequent part of this opinion. (See *post*, p. 723.) As for the guilt phase, prior to deliberations the trial court indicated to the jury that it "preferred" not to give written instructions.

Instead, the court asked the jury to listen to the oral instructions and inform the court if it had any questions the court could answer. The court noted that its reading of the instructions would require about an hour and 15 minutes.

Defense counsel failed to object to the foregoing procedure or request that written instructions be provided. Accordingly, the People contend defendant cannot raise the point on appeal. (See *People* v. *Chagolla* (1983) 144 Cal.App.3d 422, 432-433 [193 Cal.Rptr. 711].) Defendant responds that by reason of the court's announcement of its "preference," a request or objection would have been futile. We disagree. Assuming the court's statement to the jury amounted to a ruling, no reason appears why defendant should be excused from objecting thereto.

In any event, even assuming defendant has not waived the point, he would not prevail. In reviewing claims of error of the kind involved here, our main inquiry is whether the court abused its broad discretion in failing to provide written instructions. (See *People* v. *Sheldon* (1989) 48 Cal.3d 935, 943-945 [258 Cal.Rptr. 242, 771 P.2d 1330]; *People* v. *Anderson* (1966) 64 Cal.2d 633, 640 [51 Cal.Rptr. 254, 414 P.2d 882]; see also § 1093, subd. (f) [requiring court to give written instructions to jurors upon their request therefor].) Defendant urges us to reconsider *Sheldon,* pointing to our "mistaken assumption" regarding the content of the various studies on jury comprehension of oral instructions. We had stated in *Sheldon* that "it does not appear" these studies took into account the possibility of a rereading of the instructions. (*People* v. *Sheldon, supra,* 48 Cal.3d at p. 944.) According to defendant, one of the studies cited to us in that case did include "the option of asking for further instructions . . . ." It is unclear whether giving "further" instructions would include rereading ones already given. But assuming defendant is correct, any "mistake" in *Sheldon* seems harmless and entirely collateral to our holding confirming the court's broad discretion to withhold written instructions in a capital case.

The jury took only one day to reach its guilty verdict. No questions were raised regarding any of the instructions, and no request for rereading instructions was made. Thus, the record contains no evidence indicating the jury was confused or misled by the oral instructions given. (See *People* v. *Sheldon, supra,* 48 Cal.3d at pp. 944-945.) We conclude the court did not abuse its discretion in failing to provide the jury with written guilt phase instructions.

## IV.

## Penalty Issues

### A. *Denial of Challenge to Juror Williams*

Defendant asserts the court erred in failing to excuse for cause prospective juror Charles Williams, who indicated during voir dire his belief that persons such as defendant should be given the death penalty. Williams actually served as a juror in the case, despite the fact defendant retained one unused peremptory challenge following jury selection.

Juror Williams initially stated on a jury questionnaire that, based on his reading of various news articles, defendant "should be executed." When asked to elaborate, Williams stated that if defendant had indeed killed two persons as charged, he should be executed. Williams also stated, however, that he would consider a sentence of life imprisonment without parole if the mitigating circumstances warranted it, that he was "capable of listening to the evidence and making my mind up on what is presented," and that he had an "open mind" regarding this case and could ignore what he had read in the paper about defendant's crimes.

Williams also agreed there "could be reasons" why a premeditated murder would not "deserve" a death penalty, and that he could think of "many types" of such premeditated murder. When asked for an example, Williams replied that if a man killed the person who raped or killed his wife or daughter, "I see no reason to execute him for that." When asked for other examples, Williams replied, "They would be similar." The trial court denied defendant's challenge of Williams for cause on the basis that he had credibly expressed a willingness to consider any mitigating evidence.

Defendant first contends the court may have mistakenly applied the "automatic vote" standard set forth in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522, footnote 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770], in appraising defendant's challenge to Williams. ■ Defendant contends that the correct test is found not in *Witherspoon, supra,* but in *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]. Under *Witt,* the juror must be excused if his "views [on capital punishment] would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Ibid.*) We have indicated the foregoing test applies to jurors expressing views either opposing or favoring the death penalty. (*People* v. *Coleman* (1988) 46 Cal.3d 749, 764-765 [251 Cal.Rptr. 83, 759 P.2d 1260].)

The United States Supreme Court recently ruled that trial courts must permit specific voir dire inquiry as to whether a juror would "automatically" impose the death penalty without regard to the particular facts or instructions on law in the case. (*Morgan* v. *Illinois* (1992) 504 U.S. __, __ [119 L.Ed.2d 492, 112 S.Ct. 2222].) Citing both *Witherspoon* and *Witt* in support of its ruling, the high court indicated that *Witt* reflects the proper standard for determining when a prospective juror must be excused for cause because of his or her views favoring capital punishment. (504 U.S. at p. __ [119 L.Ed.2d at p. 502].)

In the present case, the court, in conducting its own voir dire, phrased some of its questions in terms of whether the prospective jurors would "automatically vote" for (or against) the death penalty regardless of the evidence. But the record also indicates the court would have denied defendant's challenge for cause under the *Witt* standard as well, based on Williams's willingness to consider the mitigating evidence in the case.

Defendant argues that Juror Williams's views favoring the death penalty strongly indicated he would be prevented from performing his duties as a juror. The People suggest, however, that Williams's responses could be deemed "conflicting" or ambiguous, and therefore the trial court's determination regarding his true state of mind should be binding on us. (See, e.g. *People* v. *Mason* (1991) 52 Cal.3d 909, 954 [277 Cal.Rptr. 166, 802 P.2d 950], and cases cited.)

Several of Williams's responses reflected his ability to weigh the aggravating and mitigating evidence. ▆▆▆ But in light of the fact defendant failed to use his one remaining peremptory challenge to excuse Juror Williams, we need not resolve whether the court erred in failing to excuse that juror for cause. (See *People* v. *Morris* (1991) 53 Cal.3d 152, 185 [279 Cal.Rptr. 720, 807 P.2d 949] ["a party's failure to exercise available peremptory challenges indicates relative satisfaction with the unchallenged jurors. Having so indicated in this case, defendant cannot reasonably claim error."]; *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1248 [270 Cal.Rptr. 451, 792 P.2d 251]; *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1087-1088 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Coleman, supra,* 46 Cal.3d at pp. 768-770 [defendant must exercise and *exhaust* his peremptory challenges to remove prospective jurors who should have been excluded for cause]; but see *People* v. *Box* (1984) 152 Cal.App.3d 461, 464-466 [199 Cal.Rptr. 532] [where defendant was improperly deprived of 16 peremptory challenges, his tactical reservation of only 1 of his allotted 10 challenges did not bar reversal].)

Defendant speculates that trial counsel was reserving his remaining peremptory challenge in the event it became necessary to challenge a prospective juror with even more extreme views than Williams. But the fact remains

that counsel expressed satisfaction with the jury selected ("We accept the jury as presently constituted"), without using his remaining peremptory challenge and without requesting additional challenges.

In *People* v. *Box, supra,* 152 Cal.App.3d at page 465, relied on by defendant, the court observed that the proper practice is for trial counsel "to express a timely on-the-record dissatisfaction with the jury at the time the jury is accepted so the reviewing court knows that *in fact* this was the situation at trial." (*Id.* at p. 465, fn. 3.) Although the present case was tried several years after *Box* was decided, no such on-the-record statement was made herein.

Leaving open the question whether *Box* correctly reversed the judgment despite the defendant's unexercised peremptory challenge, we conclude that, by expressing his satisfaction with the jury without exhausting such challenges or requesting additional challenges, defendant waived his right to complain about the court's failure to excuse Juror Williams for cause.

### B. *Denial of Challenge to Prospective Juror Mundy*

Defendant asserts the court erred in failing to excuse for cause prospective juror Mundy, who, like Juror Williams (see *ante,* p. 711 et seq.), expressed a preference for the death penalty in cases involving multiple murder. Defendant used a peremptory challenge to excuse Mundy, but, as previously discussed, his retention of an unused peremptory challenge demonstrates that any error in failing to excuse Mundy for cause was harmless. (See *People* v. *Coleman, supra,* 46 Cal.3d at pp. 768-770 [harmless error to require defendant to use peremptory challenge to excuse juror properly excusable for cause, where defendant held unused peremptory challenges]; see also *People* v. *Mason, supra,* 52 Cal.3d. at p. 954 [use of peremptory challenge to remove excusable prospective juror renders moot claim of denial of impartial jury].)

### C. *Prosecutor's Use of Peremptory Challenges*

Defendant contends the prosecutor improperly used peremptory challenges to remove jurors holding views opposed to the death penalty. The argument has been repeatedly and recently rejected. (E.g. *People* v. *Pinholster* (1992) 1 Cal.4th 865, 912 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People* v. *Ashmus* (1991) 54 Cal.3d 932, 967 [2 Cal.Rptr.2d 112, 820 P.2d 214]; *People* v. *Turner* (1984) 37 Cal.3d 302, 315 [208 Cal.Rptr. 196, 690 P.2d 669].)

### D. *Defendant's Testimony About Choice of Penalty*

During the penalty phase, after defendant had testified on his own behalf regarding his religious conversion, his remorse, and his desire for a "fair

judgment," the prosecutor asked on cross-examination, and over objection, what penalty defendant believed was appropriate for his crimes. He replied, "If I were one of the 12 jurors, I would vote for the death penalty." On appeal, defendant contends the prosecutor's question was improper for two reasons: (1) it sought information that was irrelevant to any statutory sentencing factor (see *People* v. *Boyd* (1985) 38 Cal.3d 762, 773-774 [215 Cal.Rptr. 1, 700 P.2d 782]), and (2) it tended to diminish the jury's sense of responsibility (see *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 341 [86 L.Ed.2d 231, 247, 105 S.Ct. 2633]; *People* v. *Ramos* (1984) 37 Cal.3d 136, 154-157 [207 Cal.Rptr. 800, 689 P.2d 430]). We reject both arguments.

The People observe that defendant had the right to testify on his own behalf, and on direct examination could have informed the jury of his supposed choice of penalty (see *People* v. *Guzman, supra,* 45 Cal.3d at p. 962). But the testimony at issue was elicited *on cross-examination* over defense counsel's objection, and was not simply volunteered by defendant. Thus, the issue cannot be decided on a "right to testify" basis, and we must reach the merits of defendant's contentions.

### 1. *Irrelevance.*

A defendant's opinion regarding the appropriate penalty the jury should impose usually would be irrelevant to the jury's penalty decision. (See *People* v. *Guzman, supra,* 45 Cal.3d at pp. 962-963; *People* v. *Boyd, supra,* 38 Cal.3d at pp. 773-774; but see *People* v. *Whitt* (1990) 51 Cal.3d 620, 646-648 [274 Cal.Rptr. 252, 798 P.2d 849] [defendant's response to *defense* questions asking if he wanted to live or deserved to live deemed potentially relevant mitigating evidence].) But under the circumstances here, the evidence was relevant to matters raised by defendant in his direct examination. The prosecutor's penalty question followed defendant's self-serving testimony regarding his conversion to Christianity, and his willingness to accept responsibility for his acts in the form of a "fair judgment" from the jury. Seen in the context of defendant's entire testimony, we think the prosecutor's question was unobjectionable, for it bore on the extent of defendant's remorse for his crimes, his realization of the seriousness thereof, and his willingness to atone for them by paying society's highest price. As a general rule, prosecutors should avoid asking such questions, but, under the circumstances here, we conclude no misconduct occurred.

### 2. *Jury's sense of responsibility.*

Defendant argues that allowing him to suggest to the jury an appropriate penalty may have reduced the jurors' own sense of responsibility for selecting that penalty. Defendant contends this risk was aggravated when, over defense objection, the prosecutor elicited from a defense psychiatrist the fact that the psychiatrist's former husband was working on defendant's appeal.

(See *Caldwell* v. *Mississippi, supra,* 472 U.S. at pp. 325-326 [86 L.Ed.2d at pp. 237-238] [prosecutor improperly mentioned availability of automatic appeal in closing argument].)

We have already explained why defendant's view of the appropriate penalty was relevant to certain matters raised by him on direct examination. As for the reference by the defense psychiatrist to an appeal, the record indicates the matter was raised in the course of cross-examining the psychiatrist for the limited purpose of showing her relationship with a member of the defense team. As will appear in the following part of this opinion, the jury was properly instructed regarding its responsibility to select an appropriate penalty, and we find nothing in the record indicating the jury was unduly influenced by defendant's penalty response or the reference to an appeal. Indeed, the prosecutor made no mention of either subject in his closing arguments. (See also *People* v. *Fiero* (1991) 1 Cal.4th 173, 244-245 [3 Cal.Rptr.2d 426, 821 P.2d 1302] ["passing reference" to defendant's right to appeal harmless where not made in context of possible appellate correction of erroneous death verdict]; *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1223 [259 Cal.Rptr. 669, 774 P.2d 698] [mere request by defendant for death penalty did not ensure jury would impose such penalty].)

E. *Refusal to Give Defendant's Proposed Penalty Instructions*

■■■ Defendant argues the court erred in refusing to give instructions proposed by him and dealing with various aspects of the jury's penalty determination. These instructions would have permitted the jury to consider in mitigation such factors as (1) "mercy, sentiment, and sympathy for the defendant," (2) defendant's potential for rehabilitation, loving family ties, childhood experiences, probable adjustment to prison life, and remorse, (3) any evidence offered by defendant based on his individual characteristics, and notwithstanding his culpability for the offense, (4) any mitigating aspect of defendant's background or character, and (5) any evidence that defendant was acting under the influence of a mental or emotional disturbance at the time of the offenses, regardless of degree, and whether or not the condition reduced his culpability.

Defendant also offered instructions that would have admonished the jury to ignore any aggravating factors not specifically listed by the court, and that would have permitted the jurors to consider elements of "pity, sympathy or mercy" for defendant that persuaded them that death was an inappropriate penalty in this case.

As will appear, the court gave instructions that were comparable to those requested by defendant. Thus, the court substantially modified the terms of

former CALJIC No. 8.84.1, factor (k) to clarify the jury's responsibility to consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offenses for which he is on trial." (See *People v. Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) Additionally, the court directed the jury to disregard guilt phase instructions that told the jury not to be swayed by sympathy.

Moreover, the court read to the jury a revised version of CALJIC No. 8.84.2, directing that (1) the weighing of aggravating and mitigating factors was not a mechanical or arbitrary counting of factors, (2) the jury could "assign whatever moral or sympathetic value you deem appropriate to each and all the various factors," (3) the weighing process involves determining the "appropriate" penalty under the relevant evidence, and, (4) to return a verdict of death, the jury must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating ones that they warrant a death verdict. Finally, the court instructed the jury that even if the aggravating factors substantially outweighed mitigating ones, "it is within your discretion to return a verdict of either death or life imprisonment without possibility of parole."

Thus, the instructions that defendant proposed largely duplicated those that were actually given in this case. Under these circumstances, the court did not err in refusing to give the additional instructions offered by defendant. (See *People v. Cox* (1991) 53 Cal.3d 618, 673-674 [280 Cal.Rptr. 692, 809 P.2d 351]; *People v. Benson* (1990) 52 Cal.3d 754, 805, fn. 12 [276 Cal.Rptr. 827, 802 P.2d 330], and cases cited; *People v. Andrews* (1989) 49 Cal.3d 200, 227-228 [260 Cal.Rptr. 583, 776 P.2d 285], and fn. 26 [lack of "mercy" instruction].) In addition, several of the proposed instructions were argumentative, that is, " 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' " (See *People v. Benson, supra*, 52 Cal.3d at p. 805.) No error is committed in refusing such instructions. (*Id.* at pp. 805-806; see *People v. Gordon, supra*, 50 Cal.3d at pp. 1276-1277; *People v. Williams* (1988) 45 Cal.3d 1268, 1323-1324 [248 Cal.Rptr. 834, 756 P.2d 221].)

We conclude the court did not err in refusing to give defendant's proposed instructions.

F. *Refusal to Instruct Regarding Immunity Granted to Lanora Johnson*

Defendant proposed an instruction that would have permitted the jury to consider "the concept of fairness" as applied to a case in which an

accomplice who is "equally culpable" as a principal was given immunity for the offenses with which defendant was charged. The instruction continued by telling the jury it could consider "the disparity of treatment" between defendant and Lanora Johnson, his accomplice.

Although defendant cites to cases from other states indicating that the sentencer may consider the sentences imposed on the defendant's accomplices, the California rule is clearly to the contrary. (See *People v. Johnson* (1989) 47 Cal.3d 1194, 1249 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People v. Dyer* (1988) 45 Cal.3d 26, 69-71 [246 Cal.Rptr. 209, 753 P.2d 1]; *People v. Belmontes* (1988) 45 Cal.3d 744, 811-813 [248 Cal.Rptr. 126, 755 P.2d 310].) As stated in *Johnson, supra,* 47 Cal.3d at page 1249, "The focus in a penalty phase trial of a capital case is on the character and record of the individual offender. The individually negotiated disposition of an accomplice is not constitutionally relevant to defendant's penalty determination."

We also note that defendant's proposed instruction was argumentative, focusing on the particular evidence in the case and even purporting to characterize ("equally culpable") that evidence. As previously discussed, the proposed instruction properly could have been rejected on that basis alone. (See *People v. Benson, supra,* 52 Cal.3d at p. 805.)

■ In a related argument, defendant asserts the trial court erred in denying his automatic motion for reconsideration of sentence (§ 190.4, subd. (e)) without considering the grant of immunity to Ms. Johnson. Defendant cites no California authority supporting the theory that the trial court is permitted or required to consider such matters in ruling on motions to modify sentence. Indeed, if the subject of disparate sentences for accomplices is irrelevant to the sentencing determination (*People v. Johnson, supra,* 47 Cal.3d at p. 1249), it would follow that the trial court should not consider such matters in ruling on modification motions. (See *People v. Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892] [court limited to reviewing evidence submitted to jury].)

G. *Failure to Delete Assertedly Inapplicable Sentencing Factors*

Defendant asserts the court erred under both state and federal law in failing to delete from the list of potential mitigating factors those clearly inapplicable in the case, thereby permitting the prosecutor to note their absence in his closing arguments. We have rejected similar arguments on several occasions. (See, e.g., *People v. Sheldon, supra,* 48 Cal.3d at p. 957; *People v. Johnson, supra,* 47 Cal.3d at p. 1247; *People v. Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].)

■ In a related argument, defendant contends the prosecutor committed "*Davenport* error" (see *People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861]) when he argued that the jury could consider as an aggravating circumstance the fact that the victims were not coparticipants with defendant in the offenses he committed. The People concede the error, but observe that the trial court sustained defendant's objection to the argument, the prosecutor was admonished not to make, and did not make, any similar arguments, and defense counsel explained to the jury the correct principles. Nothing in the record indicates the jury was misled by the prosecutor's brief argument in this regard. (See also *People* v. *Burton* (1989) 48 Cal.3d 843, 864-865 [258 Cal.Rptr. 184, 771 P.2d 1270] [harmless error]; *People* v. *Johnson, supra*, 47 Cal.3d at p. 1247 [same]; *People* v. *Boyde* (1988) 46 Cal.3d 212, 255 [250 Cal.Rptr. 83, 758 P.2d 25] [same].)

### H. *Defendant's Unadjudicated Prior Offenses*

During the penalty phase, the prosecution was permitted (see § 190.3, factor (b)) to introduce evidence of various prior offenses of defendant, namely, the killing of Thomas Davis, the killing of Arthur Gray, and the armed robbery and attempted murder of Mr. and Mrs. Edwin Davis. Defendant had been convicted of voluntary manslaughter for killing Thomas Davis; the remaining offenses were unadjudicated. ■ Defendant contends admission of evidence of the prior unadjudicated offenses was improper under the due process and equal protection guarantees of the state and federal Constitutions.

We have frequently held that neither the state nor federal Constitution forbids admitting evidence of the defendant's uncharged and unadjudicated offenses that involve force or violence, or the threat or attempt to use force or violence. (See *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1188 [9 Cal.Rptr.2d 834, 832 P.2d 146]; *People* v. *Medina* (1990) 51 Cal.3d 870, 906-907 [274 Cal.Rptr. 849, 799 P.2d 1282]; *People* v. *Robertson* (1989) 48 Cal.3d 18, 42 [255 Cal.Rptr. 631 [767 P.2d 1109]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480].)

In a related contention, defendant argues the court erred in allowing the People to introduce evidence of the circumstances surrounding defendant's prior offenses involving force or violence. According to defendant, section 190.3, factor (b), permits the People to prove only the fact that defendant committed the offense, not the underlying circumstances. We have frequently rejected similar contentions. (See *People* v. *Robertson, supra*, 48 Cal.3d at p. 47; *People* v. *Melton* (1988) 44 Cal.3d 713, 754 [244 Cal.Rptr.

867, 750 P.2d 741]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301].)

Defendant's equal protection claim is based on asserted restrictions on the admissibility of evidence of prior offenses or convictions in *noncapital* cases. (But see *People* v. *Ratcliffe* (1981) 124 Cal.App.3d 808, 823 [177 Cal.Rptr. 627], and cases cited.) It seems sufficient to observe that capital case sentencing involves wholly different considerations than ordinary criminal sentencing and properly allows the jury to focus on the defendant's prior criminal conduct and propensity for violence, factors deemed relevant as possible aggravating circumstances affecting the jury's ultimate penalty decision. (See *People* v. *McDowell* (1988) 46 Cal.3d 551, 568 [250 Cal.Rptr. 530, 758 P.2d 1060].) This distinction between capital and noncapital cases adequately justifies the differences in treatment cited by defendant. (See *People* v. *McPeters, supra,* 2 Cal.4th at p. 1188 [denying equal protection challenge]; *People* v. *Medina, supra,* 51 Cal.3d at pp. 906-907 [same]; cf. *People* v. *Allen* (1986) 42 Cal.3d 1222, 1286-1288 [232 Cal.Rptr. 849, 729 P.2d 115].)

### I. Defendant's Prior Manslaughter Conviction

■■■ Defendant contends the court erred in allowing the prosecutor to elicit evidence regarding the circumstances of defendant's prior conviction of voluntary manslaughter for the killing of Thomas Davis. (See § 190.3, factor (c).) Defendant asserts that, in light of the manslaughter conviction and the implied acquittal of murder charges, the jury's consideration of evidence tending to show malice or premeditation violated the proscriptions against double jeopardy in the state and federal Constitutions. We have repeatedly rejected similar contentions. (See *People* v. *Visciotti* (1992) 2 Cal.4th 1, 71 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Morris, supra,* 53 Cal.3d at p. 217; *People* v. *Melton, supra,* 44 Cal.3d at p. 756, fn. 17.) As stated in *Visciotti*, "The presentation of evidence of past criminal conduct at a sentencing hearing does not place the defendant in jeopardy with respect to the past offenses. He is not on trial for the past offense, is not subject to conviction or punishment for the past offense, and may not claim either speedy trial or double jeopardy protection against introduction of such evidence. [Citation.]" (2 Cal.4th at p. 71.)

### J. Prosecutor's Argument About Defendant's Future Dangerousness

During his penalty phase arguments, and over defendant's objection, the prosecutor rhetorically asked the jury, "How many of you would like your son or husband being a guard wherever this man may be? How many of you

would like your husband or son being a transportation officer handling him and you think you would feel safe?"

Defendant contends the foregoing argument was improper, relying on a federal decision, *Tucker* v. *Francis* (11th Cir. 1984) 723 F.2d 1504, 1507, cert. den. 478 U.S. 1022 [92 L.Ed.2d 743, 106 S.Ct. 3340], which disapproved prosecutorial argument speculating on possible murders of prison guards if the defendant were imprisoned. We have held that *expert testimony* may not be elicited in a capital case on the subject of the defendant's future dangerousness. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 773-775 [175 Cal.Rptr. 738, 631 P.2d 446].) We have also stated, however, that "We do not believe a prosecutor's comments during closing arguments present the same potential for prejudice" as the expert evidence involved in *Murtishaw*. (*People* v. *Miranda, supra,* 44 Cal.3d at p. 111; see *People* v. *Silva* (1988) 45 Cal.3d 604, 639 [247 Cal.Rptr. 573, 754 P.2d 1070]; *People* v. *Dyer, supra,* 45 Cal.3d at p. 81; *People* v. *Davenport, supra,* 41 Cal.3d at p. 288.)

We conclude that the prosecutor's brief argument quoted above fell within the range of argument permitted by the foregoing cases.

### K. *Nonstatutory Aggravating Evidence*

Defendant contends the court erred in allowing the prosecutor to elicit from penalty phase witnesses certain testimony adverse to defendant and not bearing on any of the permissible statutory aggravating factors. (See *People* v. *Boyd, supra,* 38 Cal.3d at p. 776.) The evidence at issue included prior assaultive or threatening conduct toward defendant's former wife, Janice Grindel, a threat to kill defendant's accomplice, Lanora Johnson, and physical abuse of Dianna Loggins.

In response to defendant's objection to such evidence, the trial court instructed the jury that the foregoing evidence had been admitted for purposes other than to show aggravating circumstances, and that the jury should not consider such evidence for that purpose. Defendant asserts that this instruction was inadequate to protect him, given the fact the penalty jury (1) is not required reach unanimous agreement regarding use of "prior crimes" evidence (see *People* v. *Ghent* (1987) 43 Cal.3d 739, 773-774 [239 Cal.Rptr. 82, 739 P.2d 1250]), and (2) does not receive sua sponte instructions on the requisite element of such offenses (see *People* v. *Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423]).

The People evidently concede the challenged testimony did not constitute evidence properly admissible under section 190.3, factor (b). Accordingly,

we do not address that issue. Nonetheless, we believe the court's cautionary instruction was adequate to protect defendant. As the People observe, as a general rule we must presume the jury understood and followed such admonitions or instructions. (See *Francis* v. *Franklin* (1984) 471 U.S. 307, 324, fn. 9 [85 L.Ed.2d 344, 359-360, 105 S.Ct. 1965]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1120 [240 Cal.Rptr. 585, 742 P.2d 1306].) We also note that, in light of the nature of the charged offenses, and the other properly admitted "prior crimes" evidence in this case, it is not reasonably possible defendant was prejudiced by the jury's consideration of the assaultive or threatening conduct at issue. (See *People* v. *Brown* (1988) 46 Cal.3d 432, 449 [250 Cal.Rptr. 604, 758 P.2d 1135].)

### ·L. *Failure to Reread Guilt Phase Instructions*

Following the presentation of the penalty phase evidence, defendant requested a rereading of many of the guilt phase instructions relevant to the penalty determination. The requested instructions included "generic" instructions governing the jury's consideration and evaluation of the evidence, and covered such matters as direct and circumstantial evidence, admissions and confessions, expert and lay testimony, and accomplice testimony. The court denied the request, advising the jury instead that it should follow the guilt phase instructions except as otherwise directed, and that the court would reread any guilt phase instructions at the jury's request. No such requests were made.

■ Defendant asserts the court erred in denying his request, thereby violating his Eighth Amendment right to a fair and reliable penalty determination. He observes that more than two months had elapsed since the jury had first heard the instructions at issue, and he doubts the jurors had a clear recollection thereof.

As our cases uniformly hold, we may presume the jury applied to the penalty determination any applicable guilt phase instructions. (See *People* v. *Wharton* (1991) 53 Cal.3d 522, 600 [280 Cal.Rptr. 631, 809 P.2d 290]; *People* v. *Brown, supra,* 46 Cal.3d at p. 460; *People* v. *Williams, supra,* 45 Cal.3d at p. 1321.) As stated in *Wharton, supra,* 53 Cal.3d at page 600, "Because none of these instructions was, by its terms, limited to the guilt phase, and because no penalty phase instructions contradicted those instructions, 'we believe a reasonable jury would correctly assume those "generic" instructions continued to apply.' [Citations.]" In the absence of anything in the record indicating the jury was confused or misled by the court's failure to reinstruct, we conclude that defendant's argument must be rejected.

M. *Failure to Provide Jury With Written Penalty Phase Instructions*

 Defendant complains that the trial court failed to provide the jury with a written set of penalty phase instructions to assist its deliberations. As explained in the context of a similar argument regarding the absence of written *guilt* phase instructions (*ante,* pp. 710, 711), our main inquiry is whether the court abused its broad discretion in failing to provide written instructions. (See *People* v. *Sheldon, supra,* 48 Cal.3d at pp. 943-944; *People* v. *Anderson, supra,* 64 Cal.2d at p. 640.)

The jury deliberated less than four hours before reaching its penalty verdict. No questions were raised regarding any of the instructions, and no request for rereading instructions was made. Thus, the record contains no evidence indicating the jury was confused or misled by the oral instructions given. (See *People* v. *Sheldon, supra,* 48 Cal.3d at pp. 944-945.) We conclude the court did not abuse its discretion in failing to provide the jury with written instructions.

N. *Failure to Hold Formal Competency Hearing During Penalty Phase*

Defendant complains of the trial court's failure to hold a formal competency hearing during the penalty phase once a question arose as to whether defendant had been overmedicated during his penalty phase testimony. He asserts the omission denied him statutory and constitutional protections, including his due process and confrontational rights under the state and federal Constitutions. We reject the contention.

Prior to the guilt phase, defendant had been examined by two psychiatrists who deemed him competent to stand trial. Following the guilt phase, and after the prosecutor had presented his penalty phase evidence, the defense elicited mitigating evidence from defendant personally, and from lay and expert witnesses. As previously indicated, defendant testified personally regarding his childhood, background, criminal experiences, and conversion to Christianity. In addition, he read to the jury a prepared statement expressing his remorse and requesting a "fair judgment."

Thereafter, one of defendant's experts, Dr. Peter Mayland, testified regarding defendant's life experiences and personal development. Dr. Mayland stressed how calm and controlled defendant appeared when he testified on his own behalf. On cross-examination, the prosecutor elicited from Dr. Mayland the information that he had prescribed tranquilizers (Valium and Soma) for defendant during the trial. Dr. Mayland indicated that Soma was a muscle relaxant and a "relatively light medication" which was intended to

relax defendant while testifying, and which was not likely to impair defendant's mental processes. Although at one point during defendant's testimony Dr. Mayland was concerned that he may have been overmedicated, Dr. Mayland later concluded that defendant was "okay," and was not seriously affected by the drugs.

A second defense expert, Dr. Judith Huff, testified regarding defendant's psychological profile, and confirmed that, at various stages of the trial, he had been taking Valium and Soma, as well as Elavil, a strong antidepressant. Dr. Huff opined that her ability to render an accurate psychiatric diagnosis of defendant may have been hindered by the effects of these various medications. She also believed that the dose of Soma prescribed by Dr. Mayland was twice the recommended dose, and that following defendant's testimony at trial, he seemed to lack energy and suffered short-term memory loss. Dr. Huff concluded that defendant's "emotionless" appearance at trial may have been partially a result of the drugs he was taking.

At the prosecutor's suggestion, the court held an "inquiry" outside the jury's presence to determine the effect of the foregoing drugs on defendant's competence while testifying. Defense counsel consented to this procedure.

Dr. Mayland was recalled to testify in more detail regarding the doses, and possible side effects, of the drugs prescribed for defendant. Thus, Dr. Mayland testified that shortly before defendant was scheduled to testify, and at defendant's request, he was taken off Valium and given Soma, a stronger medication aimed at easing his anxiety and anger in the courtroom and permitting him to "tell his story [to the jury] as well as possible." Defendant had told Dr. Mayland that he had tried Soma in the past and it was effective in calming his nerves.

Dr. Mayland observed only one occasion when defendant appeared possibly overmedicated, namely, when he read to the jury a statement he had composed. At this time, defendant appeared to have trouble reading the statement and his words were "quiet, slurred." But Dr. Mayland further explained that immediately following defendant's trial testimony he appeared reanimated, leading Dr. Mayland to conclude that it was the "pressure of the public eye in the courtroom," and not defendant's medication, that had affected him. On each occasion following defendant's trial testimony, Dr. Mayland observed and talked with defendant and saw no impairment in his ability to think, remember or communicate.

The defense then called Dr. Huff, who expressed her disagreement with Dr. Mayland on several points. First, she opined that defendant's need for

high doses of medication to mask a possible depression or anxiety raised "serious questions" as to his competence to stand trial. She speculated that perhaps defendant was suffering from some "underlying problem" which should have delayed his trial participation pending a more comprehensive evaluation.

Dr. Huff noted that Elavil is "very sedating" and the doses given to defendant "quite likely" could have caused some degree of mental confusion. Moreover, a large percentage of persons who are taken off Valium will suffer "withdrawal syndromes" of varying kinds. In addition, Dr. Huff felt it inappropriate to switch defendant from Valium to Soma without first assessing the possible effects of such a change in medication. Dr. Huff believed that the high dose of Soma given to defendant likely would be "highly sedating," and would have a severe influence on his "emotional demeanor" at trial.

Dr. Huff explained that although she did not view any portion of defendant's trial testimony, she talked with him in his jail cell shortly thereafter, and concluded he "looked sedated. His gait was slow. His facial expressions were very limited." Dr. Huff also noted some short-term memory loss as a probable result of the Soma. Once the Soma dose was reduced, defendant seemed "markedly more like himself."

Thereafter, the prosecutor called Dr. Lee Coleman, a physician specializing in psychiatry, who confirmed Dr. Mayland's view that personal observation of a defendant on and off the witness stand would be the best way to evaluate the effect of a given drug on his mental condition. Dr. Coleman also believed defendant's dose of Elavil was a "low" one, and that it would be unusual for a person discontinuing Valium to suffer a withdrawal syndrome that would affect his testimony at trial.

A sheriff's deputy, John Lewis, testified that on one occasion he had noticed defendant seemed temporarily depressed and unusually quiet following some "very emotional testimony" by his relatives, but that in general Lewis noticed no "mood swings" or signs of confusion or disorientation. Similar testimony was elicited from another deputy, Frank Noyes.

Following Deputy Lewis's testimony, defense counsel asked whether the proceedings should not be deemed a competency hearing under section 1368, and whether a jury should be asked to evaluate defendant's competence. The court responded that it had no doubt as to defendant's competence, and that the limited purpose of the inquiry was to determine whether defendant in fact had a fair opportunity to express himself at trial.

At the conclusion of the inquiry, the court announced its ruling. The court first noted that it had observed defendant during his testimony and was impressed at his responsiveness to questions. The court observed that defendant appeared intelligent and articulate, and at no time appeared to have difficulty expressing himself or remembering and relating his testimony. The court further found that although defendant remained calm during his testimony, he was able to express himself without hesitation. Based on the court's observations, it concluded that defendant was not oversedated or affected by drugs during his testimony, and that he was competent and had full opportunity to express himself during trial.

 Defendant now argues he was improperly deprived of a full competency hearing accompanied by a formal psychiatric evaluation and jury trial. (See §§ 1367-1369; *Pate* v. *Robinson* (1966) 383 U.S. 375, 385 [15 L.Ed.2d 815, 822, 86 S.Ct. 836]; *People* v. *Hale* (1988) 44 Cal.3d 531, 538-541 [244 Cal.Rptr. 114, 749 P.2d 769]; *People* v. *Pennington* (1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942].) In defendant's view, Dr. Huff's testimony regarding (1) the high doses of medication prescribed for him, (2) his short-term memory loss on one occasion, and (3) his possible underlying depression was sufficient to raise a doubt as to his competence to stand trial. As will appear, however, the testimony in question did not raise a *reasonable* doubt about defendant's competence, and the contention thus lacks merit.

We recently stated the applicable principles in *People* v. *Jones* (1991) 53 Cal.3d 1115 [282 Cal.Rptr. 465, 811 P.2d 757], as follows: "A defendant who, as a result of mental disorder or developmental disability, is 'unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner,' is incompetent to stand trial. (§ 1367.) When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. (*People* v. *Stankewitz* (1982) 32 Cal.3d 80, 92 [184 Cal.Rptr. 611, 648 P.2d 578].) Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competence to stand trial. (*Moore* v. *United States* (9th Cir. 1972) 464 F.2d 663, 666.) The court's duty to conduct a competency hearing arises when such evidence is presented at any time 'prior to judgment.' (§ 1368; see also § 1367; *People* v. *Zatko* (1978) 80 Cal.App.3d 534 [145 Cal.Rptr. 643], 548; *People* v. *Melissakis* (1976) 56 Cal.App.3d 52, 62 [128 Cal.Rptr. 122].)" (*People* v. *Jones, supra,* 53 Cal.3d at pp. 1152-1153; see also *People* v. *Howard* (1992) 1 Cal.4th 1132, 1163 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; *People* v. *Kelly* (1992) 1 Cal.4th 495, 542 [3 Cal.Rptr.2d 677, 822 P.2d 385]; *People* v. *Price* (1991) 1 Cal.4th 324, 396-397 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

The trial judge's ruling regarding whether a competency hearing is required should be given great deference. "An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper." (*People* v. *Merkouris* (1959) 52 Cal.2d 672, 679 [344 P.2d 1]; see 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 3003, p. 3683, and cases cited.)

Additionally, we have noted that " 'more is required to raise a doubt [of competence] than mere bizarre actions [citation] or bizarre statements [citation] . . . or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [citation].' " (*People* v. *Deere* (1985) 41 Cal.3d 353, 358 [222 Cal.Rptr. 13, 710 P.2d 925].)

Applying these principles to the record before us, we cannot say as a matter of law that the evidence raised a reasonable doubt as to defendant's mental competence. As previously noted, a defendant is mentally incompetent "if, *as a result of mental disorder or developmental disability*, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, italics added.) The evidence regarding defendant's drug doses, and his demeanor on and off the witness stand, indicated at most that he may have been overmedicated, but no substantial evidence was raised indicating he was unable to understand the nature of the proceedings or to cooperate with his counsel. Indeed, based on the observations of those persons who, unlike Dr. Huff, actually witnessed his trial testimony and demeanor, the contrary appears true. In light of the entire record, we conclude the court was not required to order a formal competency hearing.

A similar situation arose in *People* v. *Price, supra,* 1 Cal.4th 324, where, following defendant's heated expression of his concerns regarding his counsel's representation, the prosecutor suggested the court might wish to comment on his demeanor. The court noted for the record that the defendant appeared "extremely upset," and under great "emotional stress." The court further stated it was unclear whether a "1368 problem" was indeed presented. (See *id.* at pp. 395-396.) Defense counsel, having experience as a social worker, expressed her belief that the defendant may be having a "psychotic episode" as well as suffering from delusions. The court, declining to express "a 1368 doubt," nonetheless appointed a psychiatrist to further examine the defendant and report regarding his competence to stand trial. (*Ibid.*)

In *Price*, the resulting psychiatrist's report was inconclusive, expressing insufficient information to determine the defendant's ability to rationally

collaborate with counsel. The court nonetheless declined to commence formal competency proceedings. We rejected a claim of error, finding no substantial evidence of the defendant's incompetence, and rejecting the contention that the court's own expressed concern about the defendant's competence should be deemed an expression of "doubt" sufficient to trigger formal competency proceedings. As we stated in *Price*, "A trial court's expression of *preliminary concerns* about competency does not require the commencement of competency proceedings. [Citation.]" (*People* v. *Price, supra*, 1 Cal.4th at pp. 396-397, italics added; accord, *People* v. *Gallego* (1990) 52 Cal.3d 115, 159, 162-163 [276 Cal.Rptr. 679, 802 P.2d 169].)

Similarly, in the present case, the trial court expressed preliminary concerns about defendant's prior opportunity to fully express himself at trial, concerns that were deemed sufficient to justify the limited "inquiry" that was held. As in *Price*, we reject the contention that the court was required to take any additional steps to satisfy these concerns. (*People* v. *Price, supra*, 1 Cal.4th at p. 397.)

O. *Admission of Dr. Coleman's testimony*

■ Defendant next contends the court erred in permitting Dr. Lee Coleman, a physician specializing in psychiatry, to testify at the penalty phase regarding the doubtful value of certain psychiatric testimony. This testimony followed that of the defense psychiatrists, Drs. Mayland and Huff, reviewing defendant's psychological development and predicting his ability to function well in prison if sentenced to a life term without possibility of parole.

To rebut the foregoing testimony, the prosecutor elicited from Dr. Coleman his opinion that psychiatric testimony is generally neither reliable nor scientific; that forensic psychiatrists have no particular expertise or skills in predicting future violent behavior; that a psychiatrist is subject to high risks of being manipulated by his patient, and that accordingly a psychiatrist's evaluation of such matters as a criminal defendant's credibility, motivation or remorse, based merely on a psychiatric examination or interview with him, is no more reliable than the evaluation that could be formed by a layperson or juror directly confronting the evidence.

In Dr. Coleman's view, the best way to evaluate a defendant's credibility or motives is simply to look at the evidence, listen to the witnesses, and decide the issue on the basis of the facts in the case. On several occasions, Dr. Coleman stressed that he is not suggesting that courts should bar psychiatrists from the courtroom, because he acknowledged that current law

allows them to testify. But, according to Dr. Coleman, in evaluating the credibility of psychiatric testimony, the court and jury should be permitted to take into account its considerable shortcomings.

Initially, it appears defendant has waived his present challenge to Dr. Coleman's testimony by failing to secure a ruling on his objection at trial. When Dr. Coleman was first asked his opinion regarding the reliability of psychiatric testimony, defense counsel remained silent and failed to object. After Dr. Coleman responded, summarizing his view that such testimony was unreliable, the prosecutor asked, "And then why are you here testifying then?" Dr. Coleman responded that the purpose of his forthcoming testimony would be to testify "about that" (i.e., the unreliability of psychiatric testimony), and only then did defense counsel object on the basis that such testimony would be irrelevant and a "legal conclusion."

The trial court *sustained* the objection as it pertained to the last question posed by the prosecutor on the sole basis that "The reason why he's [Dr. Coleman] here is to answer questions you're going to ask him. So go ahead and ask your questions." The court did not rule on the issue of the admissibility of Dr. Coleman's proposed testimony, and defense counsel did not request a ruling on his objection.

Thereafter, Dr. Coleman stated at length his view of the unreliability of psychiatric testimony, without objection by defense counsel on grounds of inadmissibility. (Counsel did pose a few objections on other grounds.) Thus, defendant has waived the issue on appeal by failing to request a ruling on his earlier objection or by renewing that objection. (See *People* v. *Rhodes* (1989) 212 Cal.App.3d 541, 554 [261 Cal.Rptr. 1], and authorities cited.).

But assuming, arguendo, no such waiver occurred, we find no error in admitting Dr. Coleman's testimony. Defendant asserts this testimony, being a "generalized attack on the propriety of forensic psychiatric testimony," was irrelevant to the issues once the court had determined that Drs. Huff and Mayland were competent and qualified to testify as experts. According to defendant, Dr. Coleman's testimony was contrary to state and federal law recognizing that psychiatric opinions may be helpful to the court and jury. (See, e.g., § 987.9; *Ake* v. *Oklahoma* (1985) 470 U.S. 68 [84 L.Ed.2d 53, 105 S.Ct. 1087]; *People* v. *Worthy* (1980) 109 Cal.App.3d 514 [167 Cal.Rptr. 402].)

We had occasion to consider similar testimony by Dr. Coleman in *People* v. *Babbitt* (1988) 45 Cal.3d 660, 698-700 [248 Cal.Rptr. 69, 755 P.2d 253] (hereafter *Babbitt*), in the course of ruling on a claim of prosecutorial

misconduct arising from the prosecutor's reliance on Dr. Coleman's testimony to disparage opinions by defense experts. In *Babbitt*, we summarized the gist of that testimony (which cast doubt on the ability of psychiatrists and psychologists to form helpful opinions regarding a criminal defendant's mental state), and concluded, "Viewed in the context of Dr. Coleman's testimony, the prosecutor's comments disparaging the expertise of the defense psychologist and psychiatrist to form an opinion about defendant's mental state were based on the evidence. *The comments went to the weight of the witnesses' testimony, not its admissibility.* The remarks therefore were not improper. [Citations]." (45 Cal.3d at p. 699; italics added.) At no point in our opinion did we suggest that Dr. Coleman's testimony was improper or inadmissible.

In *Babbitt*, we noted that additional remarks by the prosecutor, labelling psychiatric courtroom testimony a "social cancer," approached misconduct, constituting a general attack against forensic psychiatry. We observed that "The law permits a defendant to assert a psychiatric defense and to have expert witnesses testify in his behalf. The courtroom is not the proper forum to challenge the propriety of this system." (45 Cal.3d at p. 700.) We also noted, however, that the prosecutor's remarks were nonprejudicial because neither the prosecutor nor Dr. Coleman asked the jury to disregard psychiatric opinion, for both realized the law permits the jury to consider it. In addition, the court had instructed the jury that the law permitted expert evidence on the issue of defendant's mental state and the jury was told to give that testimony the weight to which to which the jury found it entitled. (*Ibid.*)

Similar considerations lead us to conclude that admission of Dr. Coleman's testimony in this case was neither improper nor prejudicial. As indicated above, as in *Babbitt*, Dr. Coleman freely conceded that he was not suggesting that courts should bar psychiatrists from the courtroom, because present law allows them to testify and permits the jury to consider their opinions. His criticism of forensic psychiatry, and specifically the opinions of Drs. Huff and Mayland, thus went more to the weight of those opinions rather than their admissibility. (See *Babbitt*, 45 Cal.3d at p. 699; see also *People* v. *Prince* (1988) 203 Cal.App.3d 848, 857-858 [250 Cal.Rptr. 154] [upholding admissibility of similar testimony by Dr. Coleman as relevant to the weight and credibility accorded defense experts]; *State* v. *Zespy* (Wyo. 1986) 723 P.2d 564, 568 [same].)

Moreover, as in *Babbitt*, the trial court herein instructed the jury that a duly qualified expert (such as Dr. Huff or Dr. Mayland) was entitled to state an opinion on a matter at issue in the trial. Additionally, the jury was

instructed that it was not bound to accept an expert opinion (such as Dr. Coleman's) as true and was entitled to disregard it if unreasonable. Thus, again as in *Babbitt,* any impropriety in Dr. Coleman's testimony must be deemed "clearly nonprejudicial." (*Babbitt,* 45 Cal.3d at p. 700.)

### P. *Constitutionality of Sentencing Procedure*

Defendant asserts the state's sentencing procedure in capital cases is constitutionally flawed in various respects, including the failure to explain to the jury which factors are mitigating and which are aggravating, the failure to require a jury finding that death is an appropriate penalty beyond a reasonable doubt, and the failure to require written jury findings as to the particular aggravating factors found to warrant the death penalty. Each of these contentions has been repeatedly rejected. (See, e.g., *People* v. *Wharton, supra,* 53 Cal.3d at p. 603; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].)

### Q. *Sentence Not Arbitrary or Disproportionate*

 Finally, defendant argues that his sentence is arbitrary, discriminatory and disproportionate in light of the nature of his crime, and he urges us to undertake a proportionality review of his sentence. Neither the state nor federal Constitution requires such review. (See *People* v. *Wharton, supra,* 53 Cal.3d at p. 603, and cases cited.) Moreover, even were such a procedure mandated in this state, it is inconceivable that this defendant, having murdered an elderly couple for financial gain, would benefit from it.

The judgment is affirmed.

Panelli, J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I agree with Justice Kennard's concurring and dissenting opinion: the convictions and special circumstance findings must be sustained, but the sentence of death must be set aside because the trial court erroneously permitted the prosecutor to ask defendant at the penalty phase, "And . . . what do you think your just punishment should be?"

Consistency, thou art a jewel—but to some prosecutors intent on obtaining a verdict of death, the jewel is rare indeed.

In *People* v. *Whitt* (1990) 51 Cal.3d 620 [274 Cal.Rptr. 252, 798 P.2d 849], defense counsel asked Whitt in the penalty phase of his trial: "And do you

want to live?" and "Why do you deserve to live?" The trial court sustained prosecution objections to the questions on grounds that the answers sought were irrelevant and self-serving. Irrelevant? Life or death is the ultimate issue. Self-serving? That is the very purpose of mitigating evidence. Unsurprisingly, the jury fixed the penalty at death.

The trial court's rulings barring Whitt's response were clearly erroneous under *Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669], and clearly prejudicial under *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].

A bare majority of this court did not, or would not, recognize that fact. While they reluctantly conceded the trial court erred, and cautioned judges in future cases "against imposing similar restrictions on a capital defendant's constitutionally protected right to give relevant penalty phase testimony" (*People* v. *Whitt, supra,* 51 Cal.3d at p. 647, fn. 17), they nevertheless labeled the error "harmless" and hastened Whitt along his way to the execution chamber.

In effect, the majority in *Whitt* told prosecutors that they can prevent a defendant's testimony for life at no risk. For their part, the majority in this case tell them that they can elicit a defendant's testimony for death with impunity. Thus, to prosecutors the prevailing rule appears to be: If a defendant wants to live, his mouth may be sealed; by contrast, if he wants to die, he may speak freely. This is an unconscionable double standard.

I have no doubt that defendant's response to the prosecutor's improper question—"If I were one of the 12 jurors, I would vote for the death penalty"—must have had an adverse effect on the jury as it deliberated whether defendant was to live or die, and cannot be dismissed as merely "harmless." It does not require a crystal ball to sense some, perhaps all, of the jurors thinking or saying: "If defendant himself would vote for death, why should we do otherwise?"

For the foregoing reasons, I would set aside the sentence of death.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the affirmance of the judgment as to guilt and special circumstances, but I dissent from the affirmance of the judgment as to penalty.

In my view, the trial court erred when it permitted the prosecutor, over defense objection, to ask defendant what punishment would be just for his capital crimes. The question called for an opinion on the ultimate issue

before the jury at the penalty phase, an issue on which defendant's personal opinion could have no conceivable bearing.

The error was prejudicial. Defendant's admission that death was the just punishment for his crimes—an admission that must have electrified the courtroom—seriously undermined the defense case for the alternative penalty verdict of life imprisonment without possibility of parole. Because the balance of aggravating and mitigating circumstances was fairly debatable in this case, there is a reasonable possibility that the error affected the penalty verdict. I would therefore set aside the judgment of death and remand the matter for a limited new trial on the issue of penalty.

I

Defendant testified in his own behalf at the penalty phase. At the conclusion of the direct examination, defendant accepted his counsel's invitation to make a statement to the jury in mitigation.

Defendant told the jurors he was not the same person he had been when he was arrested or when he had killed the Shaffers. Defendant had recently begun to read the Bible, he said, and to "accept Jesus Christ as being real." As a result of this religious experience, and as a result also of realizing "the value of the human lives" he had "stolen," defendant's "attitudes" and "personality in general" had undergone "noticeable changes." Defendant said he had tried to be sincere and truthful in his testimony and had tried "to find some way to explain or apologize to the Shaffer family for the misery and anguish" they had experienced because of his "lack of respect for human life and [the] rights of all people."

Addressing the jury, defendant concluded with these words: "I'm not asking any favors of you except fair judgment. I just want to thank you all for the sacrifices you have made to be here and to judge this case."

Near the beginning of the prosecutor's cross-examination, the following exchanges occurred:

"Q. Have you learned now that the Bible tells you to live by the law of the land?

"A. Yes, sir.

"Q. And that you're responsible for your own acts?

"A. Yes, sir.

"Q. And that you are subject to the law and have to take the punishment that's prescribed by the law?

"A. Yes, sir.

"Q. And as such what do you think your just punishment should be here?

"Mr. McClure [defense counsel]: I object. That's not relevant, your honor.

"The Court: Overruled.

"Mr. McClure: As to what he thinks.

"The Court: Overruled.

"The Witness: If I were one of the 12 jurors, I would vote for the death penalty."

Thus, after eliciting defendant's admission that he was "subject to the law and [would] have to take the punishment that's prescribed by the law," the prosecutor asked for defendant's opinion "as such" concerning the just punishment in this case. Because the jury had convicted defendant of two first degree murders with special circumstances, and because the law prescribes only two possible punishments for these crimes—death and imprisonment for life without possibility of parole—the prosecutor's question called for defendant's opinion as to which of these penalties would be his "just punishment." Thus, the question effectively made defendant a juror in his own trial, forcing him to decide the ultimate issue of penalty. That defendant so understood the question is shown by his answer: "If I were one of the 12 jurors, I would vote for the death penalty."

A defendant's opinion about the just punishment for his or her own crimes has no relevance to the issue the jury must decide at the penalty phase of a capital prosecution. Penal Code section 190.3 lists the factors that the jury may consider in determining the punishment for capital murder. Most of these factors relate directly to the charges that resulted in guilty verdicts and true findings at the guilt phase of the trial. For instance, the jury is directed to consider at the penalty phase the circumstances of these crimes and the related special circumstances (factor (a)), together with specific aspects of the defendant's mental condition during the commission of these criminal

acts (factors (d) [extreme mental or emotional disturbance], (f) [reasonable belief in moral justification], (g) [extreme duress or substantial domination by another], & (h) [impairment caused by mental disease, defect, or intoxication]), and the defendant's age (factor (i)) at the time of the crimes.

In addition to the Penal Code section 190.3 factors relating to the capital crimes, the jury is to consider any other criminal activity by the defendant involving actual or threatened violence (factor (b)), prior felony convictions (factor (c)), and "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime" (factor (k)). This last factor includes any aspect of the defendant's character or record on which the defendant seeks to rely in mitigation. (*People* v. *Boyd* (1985) 38 Cal.3d 762, 775 [215 Cal.Rptr. 1, 700 P.2d 782].)

Appearing nowhere on Penal Code section 190.3's list of penalty factors, a defendant's opinion as to the just punishment for his or her own capital crimes cannot in itself be a circumstance either in aggravation or mitigation. The majority effectively concedes this by stating that in a capital case the defendant's opinion regarding the appropriate penalty "usually would be irrelevant to the jury's penalty decision." (Maj. opn., *ante*, p. 715.) Thus, defendant's penalty opinion could lawfully play no *direct* role in the jury's penalty decision.

The majority nevertheless seeks to justify the trial court's ruling by asserting that a capital defendant's penalty opinion may play an *indirect* role as an intermediate fact tending to prove some other fact that would be mitigating or aggravating. The majority offers three such facts: "the extent of defendant's remorse for his crimes, his realization of the seriousness thereof, and his willingness to atone for them by paying society's highest price." (Maj. opn., *ante*, p. 715.) But the majority does not explain how these facts relate to the statutory penalty factors.

None of the three facts cited by the majority relates to the circumstances of the crime, to other criminal acts by defendant, or to prior convictions of the defendant. Thus, they are not admissible under factors (a), (b), or (c) of Penal Code section 190.3.

The facts cited by the majority do have some bearing on defendant's character, and therefore evidence concerning them could be introduced under factor (k) of Penal Code section 190.3. But factor (k) evidence can only be mitigating; the prosecution's case in aggravation may not include unfavorable character evidence. (*People* v. *Boyd, supra*, 38 Cal.3d 762, 774-775.)

Nevertheless, if the defendant "opens the door" by offering mitigating evidence of a particular aspect of his character, the prosecutor may introduce rebuttal evidence so long as it relates to the same specific incident or character trait. (*People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1192-1193 [270 Cal.Rptr. 286, 791 P.2d 965].) Because I can conceive of no other theory of admissibility, and the majority opinion suggests no other, I assume that this is the basis on which the majority upholds the trial court's ruling.

Defendant's testimony on direct examination tended to prove that he had come to appreciate the gravity of the wrong he had done by killing the Shaffers and that he was remorseful. To the extent that it tended to prove these facts, his testimony constituted favorable character evidence under factor (k) of Penal Code section 190.3, and thereby opened the door to rebuttal by the prosecution directed to the same specific traits or aspects of defendant's character. The prosecutor could, in other words, seek to establish by cross-examination that defendant failed to fully appreciate the enormity of his crimes and did not feel as much remorse as he apparently claimed or as his crimes warranted.

Whether the prosecutor could properly inquire about the third topic—defendant's "willingness to atone for [his crimes] by paying society's highest price"—is much less clear. Conceivably, a capital defendant might offer his or her willingness to be executed as favorable character evidence in mitigation, on the theory that it demonstrated remorse and appreciation of the seriousness of the capital crimes, but defendant did not do so in this case. True, defendant told the jury he was not asking them for favors, only fair judgment, but such testimony is a far cry from voluntary agreement to undergo execution. In any event, I perceive no theory under which this topic could be relevant other than to show remorse or appreciation for the gravity of the capital crimes. Thus, the majority has identified at most two aspects or traits of character that defendant placed in issue by his direct testimony.

Of course, the prosecutor did not ask defendant how much remorse he felt, or whether he would willingly be executed. The prosecutor posed a quite different question. The prosecutor asked defendant, in effect, whether execution or life imprisonment without parole would be the more just punishment in this case. I seriously question whether a capital defendant's opinion as to the just punishment for his or her own crimes has "any tendency in reason" to prove the degree of the defendant's remorse or the defendant's willingness to undergo the ultimate penalty of death. (See Evid. Code, § 210 [defining "relevant evidence" as evidence "having any tendency in reason to

prove or disprove any disputed fact that is of consequence to the determination of the action"].) But I do not pursue this point further, because the majority's reasoning suffers from a more basic defect.

The majority's theory of relevance necessarily assumes there is a "right" and a "wrong" answer to the prosecutor's question. It assumes, in other words, that if defendant had given a different answer, if he had replied that life imprisonment without parole was the just punishment for his crimes, the prosecutor properly could have argued and the jury reasonably could have inferred that defendant's remorse was insufficient and that he did not fully appreciate the gravity of his crimes. Yet a juror could draw these inferences only by first deciding that defendant's penalty opinion was manifestly incorrect. To do this—to decide that perpetual imprisonment was inadequate punishment for defendant's crimes—a juror necessarily would have to prejudge the penalty issue.

Thus, the majority's reasoning is fatally circular. To be relevant, evidence introduced at the penalty phase must assist the jurors in determining the appropriate penalty. But the evidence at issue here could not be used, and thus was logically worthless, unless and until the jurors determined whether the penalty of death was appropriate.

The majority's reasoning involves more than a mere logical fallacy. It permits fundamentally unfair cross-examination of a capital defendant in every case in which the defendant, in penalty phase testimony, admits guilt while at the same time expressing remorse and describing rehabilitation. A question calling for the defendant's opinion as to the just penalty in the case presents the defendant with a Hobson's choice, because there can be no exculpatory answer. A defendant who replies, as this defendant did, that death would be the just punishment, thereby provides persuasive support for the prosecution's position and becomes perhaps the most damaging witness against his or her own cause. A defendant giving the opposite response, that life imprisonment without parole is the just punishment, is thereby laid open to the prosecution's express or implied charge that the claimed remorse and rehabilitation are insufficient or even insincere. Finally, a defendant who declines to directly answer the question can expect the prosecutor to characterize the response as evasive and uncooperative.

For all these reasons, I conclude that defendant's opinion on the ultimate issue of penalty was irrelevant—that is, it had no tendency in reason to prove or disprove any disputed fact of consequence to the penalty determination. Therefore, the trial court erred in overruling the defense objection to the

prosecutor's question asking defendant what he thought his "just punishment" should be.

## II

When an error other than a violation of the federal Constitution occurs at the penalty phase of a capital trial, this court must reverse the judgment as to penalty if there is a reasonable possibility that the error affected the verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 447-448 [250 Cal.Rptr. 604, 758 P.2d 1135].) This is a "more exacting standard of review" than that employed for state law errors at the guilt phase. (*Id.* at p. 447.) Different standards are warranted by the "fundamental difference between review of a jury's objective guilt phase verdict, and its normative, discretionary penalty phase determination." (*Ibid.*) When evidence has been erroneously received at the penalty phase, this court should reverse the death sentence if it is "the sort of evidence that is likely to have a significant impact on the jury's evaluation of whether defendant should live or die." (*People* v. *Phillips* (1985) 41 Cal.3d 29, 83 [222 Cal.Rptr. 127, 711 P.2d 423] [cited with approval in *Brown, supra,* at p. 447].)

Here, the improperly received evidence was defendant's stated opinion that he would vote for death were he one of the twelve jurors. This dramatic testimony could not fail to make a strong and indelible impression on the jurors, and to have a "significant impact on the jury's evaluation of whether defendant should live or die." (*People* v. *Phillips, supra,* 41 Cal.3d 29, 83.)

How would a reasonable juror make use of this improperly received evidence? If a juror believed the issue of penalty was otherwise close, the juror might overcome any doubts about the appropriateness of the death penalty in this case with the thought that even defendant found this a proper case for a death verdict. This court must reverse the penalty verdict if there is a reasonable possibility that the jury's sense of responsibility for the penalty verdict was diminished in this fashion. (See *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 328-329 [86 L.Ed.2d 231, 238-240, 105 S.Ct. 2633]; *People* v. *Farmer* (1989) 47 Cal.3d 888, 924-931 [254 Cal.Rptr. 508, 765 P.2d 940].)

The majority concludes that the testimony could not have diminished the jurors' sense of responsibility because the jury was properly instructed regarding its responsibility and because the prosecutor did not mention the testimony during argument. (Maj. opn., *ante,* pp. 715-716.) I disagree.

By overruling the defense objection to the question eliciting this testimony, the trial court necessarily implied that defendant's "just punishment" opinion was a proper subject for cross-examination, and therefore that defendant's response had some legitimate role in the process of penalty determination. Nothing in the trial court's instructions to the jury contradicted this erroneous suggestion. There is no reason for this court to assume that the jurors understood they were to disregard evidence that had been adduced during the penalty trial with the trial court's express approval. The prosecutor's silence on the point did not cure the problem; it left the jury with no guidance on the proper use of this testimony.

As repulsive as defendant's crimes were, this is not a case in which the capital murders were many and of astonishing cruelty, nor is this a case in which the defense introduced little or no evidence of potentially mitigating circumstances. This is not a case, in other words, in which I can say with confidence that the death penalty was foreordained or even highly likely. I cannot escape the conclusion that there is a reasonable possibility that the improperly received evidence affected the penalty verdict. Therefore, I would reverse the judgment as to penalty.

Appellant's petition for a rehearing was denied December 30, 1992, and the opinion was modified to read as printed above.