[No. H002102. Sixth Dist. July 18, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
EVA PRINCE, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication. The portions to be published are as follows.

COUNSEL

Jimmie Tinsley, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Frances M. Dogan and Mary A. Roth, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CHAPMAN, J.*—By amended information, defendant Eva Karen Prince was charged with (1) murder (Pen. Code, § 187),[1] (2) murder in the commission of a felony (§ 187), (3) attempted murder (§§ 664/187), (4) arson of an inhabited structure (§ 451, subd. (b)), (5) arson causing great bodily injury (§ 451, subd. (a)), (6) assault by means of force likely to cause great bodily injury (§ 245, subd. (a)), and (7) burglary (§ 459). As to the charges of attempted murder, arson, assault, and burglary, it was also alleged that Prince intentionally and personally inflicted great bodily injury (§ 12022.7).

---

*Assigned by the Chairperson of the Judicial Council.
[1] Further statutory references are to the Penal Code unless otherwise specified.

Prince entered a plea of not guilty to each of the charges, and denied each of the great bodily injury allegations. Thereafter, the criminal charges were adjourned pending a determination of her then mental condition pursuant to section 1368. A jury found Prince was competent to stand trial. Thereafter, Prince entered an additional plea of not guilty by reason of insanity (§ 1026).

A jury having been waived on the plea of not guilty, the trial court found Prince guilty of (1) murder in the commission of a felony, (2) arson of an inhabited structure, (3) arson causing great bodily injury, and (4) burglary. The court found Prince not guilty of premeditated murder and attempted murder, and found the allegations of intentional infliction of great bodily injury to be not true.

A jury was also waived on the plea of not guilty by reason of insanity. By stipulation, this issue was submitted to the court on the basis of the testimony and reports of three psychiatrists. The court found Prince not guilty by reason of insanity. The criminal proceedings were then suspended, and Prince was committed to Patton State Hospital (§ 1026). She appeals that commitment (§ 1237, subd. (a)).

Three grounds for appeal are alleged: (1) That the prosecutor committed misconduct in the competency trial by suggesting that the jury could consider Prince's courtroom behavior in reaching its verdict; (2) that the trial court erred in admitting testimony in the competency trial as to the propriety and value of psychiatric testimony; and (3) that Prince was improperly convicted of two separate crimes of arson.

### FACTS RELEVANT TO THE PLEA OF NOT GUILTY

In the early morning hours of May 24, 1984, the residence of Robin Jackson and his roommate, Valerye Davey, was torched by a fire bomb. Jackson was severely burned. Davey was killed.

Defendant Eva Prince has been severely mentally disturbed since her early teenage years. In 1983, when she was 29 years old, she met Robin Jackson. They were then residents in a communal household in San Francisco. Jackson was an LSD user, and obsessed with mental telepathy and other forms of parapsychic phenomena. Not long after they met, Prince became pregnant by Jackson and refused his request to abort. Jackson left Prince in the summer of 1983, but they soon reunited, living together in Santa Cruz for a short period before again separating. Their child, Byron, was born in San Jose in early 1984. Jackson was present during part of the birth, but then left shortly thereafter and did not see Prince for a time.

Later, they discussed getting married, but Jackson decided against it, upsetting Prince.

In early May 1984, Prince decided she did not want to marry Jackson or have anything to do with him. Nevertheless, Jackson continued to visit her and the child and, at times, tried to convince her that the relationship might work.

On May 17, 1984, a week before the fire, Jackson broke a date he had made with Prince and struck her when she tried to talk with him. The couple had a history of hitting one another; on one occasion, Jackson, a martial arts expert, broke Prince's nose.

Both Jackson and Prince believed that Jackson could and did transmit his thoughts from a distance directly into Prince's mind, and that he could slap and beat her "psychically" as well as physically. Often, and probably as recently as the week prior to the fire, Prince complained about these psychic visits and told Jackson she could no longer tolerate them, but he told her he was "hardwired" and could not stop broadcasting his thoughts. At one point, he became angry with Prince and told her that he had put a curse on her. He states he took the curse back a few days later, but never told Prince.

A witness, Casey Kelliher, spoke with Prince three days before the fire. Prince told Kelliher that her relationship with Jackson (referred to as her child's father) was very difficult, that she could not keep him out of her life, that he borrowed money and beat her, and that the relationship was so painful that she had thoughts of killing him.

On May 23, 1984, the day before the fire, Prince bought a can of gasoline at a Santa Cruz Chevron station. A station employee noticed that she was shaky, jittery, frantic, and talking "mumbo-jumbo." Outside her home, Prince transferred some of the gasoline to a bottle. Later she was seen with a few highway flares. Those who observed her with the flares testified that she appeared spaced out and on drugs.

The evidence overwhelmingly proves that late that night Prince went to Jackson's apartment, let herself in, splashed gasoline on the floor, rugs, and on hanging sheets used as room dividers. A highway flare was used to ignite the gasoline. The apartment virtually exploded. Davey's burned body was found several feet inside the door. Jackson, with second-degree burns over 50 to 55 per cent of his body, managed to break out through a window, severely cutting himself in the process.

Prince had been seen in the vicinity of the fire, and her car was seen parked nearby.

Prince returned to her apartment which she was sharing with Beth Munther. Munther noticed a smell similar to paint thinner, gasoline, or an ammonia mixture, which dissipated after Prince took a shower. Before getting into the shower, Prince told Munther, "I can't sleep. I feel horrible. I gave Robin some gasoline. He said he was going to kill somebody."

## FACTS RELEVANT TO MENTAL COMPETENCE

At the jury trial to determine Prince's competency to stand trial, the prosecution presented testimony from several detention officers that, during their contact with Prince since her incarceration, she was coherent, lucid, responsive, and able to follow rules.

Barbara Murray, a clinical psychologist, testified for the prosecution and gave her expert opinion, based upon an interview she had with Prince three days prior to the commencement of the competency trial, that Prince was presently competent to stand trial. Murray had examined Prince both in April and in September of 1985. She found Prince severely impaired in April but felt that by September Prince was not acting psychotic, understood the nature of the proceedings and its possible consequences, and was not sufficiently incapacitated in her ability to assist in her defense as to render her incompetent.

James Missett, a psychiatrist, testified for the defense. He also examined Prince both in April and in September of 1985. In April, he concluded that Prince was then incapable of cooperating with her attorney in a rational fashion in preparing a defense. Based upon an interview with Prince on September 12th and another on September 24th, the day his testimony began, Missett was even more certain than before that Prince was not competent to stand trial.

Dr. Lee Coleman, a psychiatrist, testified for the prosecution that the "expert" opinions of psychiatrists and psychologists as to competency are unreliable and deserve no weight or credibility.

## FACTS RELEVANT TO THE PLEA OF NOT GUILTY BY REASON OF INSANITY

After a jury finding of competency and a court finding of guilt, reports and testimony of three psychiatrists were admitted at the sanity phase of the court trial. All three psychiatrists concluded that Prince was legally insane at the time she committed her criminal conduct and the trial court so found.

### DISCUSSION OF CLAIMED ERROR IN THE COMPETENCY TRIAL

Prince contends (1) that the prosecutor erred in telling the jury they could consider the defendant's courtroom conduct, and (2) that the trial court erred in allowing evidence critical of psychiatric expert testimony. She further contends that the cumulative effect amounts to reversible error.

We find that neither the prosecutor nor the court was in error.

■ As to the first, during her opening statement, the prosecutor first explained that several detention officers would testify as to their "common sense" observations regarding how Prince "reacts, how she responds to questions, how she responds to tasks, how she is performing in the jail, whether she has problems communicating, getting along with people in the jail." The prosecutor next told the jury: *"You can sit here and observe her in the courtroom. You might not hear her testify, but you can make observations of her. Your senses are open to you in this trial. And we ask you to use them, to look at the testimony."* After telling the jurors to use their common sense in evaluating the doctors' reports and Prince's performance on intelligence tests, the prosecutor reiterated: "Take your common sense with you into the jury room, your ordinary, everyday experiences. Utilize all of the testimony. Please do not jump to conclusions based on Witness No. 1, No. 2 or No. 3."

After the prosecutor finished his opening statement, the following colloquy occurred between the trial court and juror No. 12: "JUROR NO. 12 (Andrew Jenkins): One other question. It was just stated by the D.A. that we were allowed to observe not only the testimony but the interactions between the defendant—[¶] THE COURT: Well, you don't have to sit in court and close your eyes. [¶] JUROR NO. 12: If she is not being called to the stand, is observing such things as interaction with her counsel—is that something we can take into consideration? [¶] THE COURT: It's something we can't stop you from taking into account. But on the other hand, the testimony from the stand—these are the facts. Okay. Your other experiences you bring to court—and I'll read you the law. And this is the reason the attorneys took so much time in examining the varius [*sic*] prospective jurors . . . . [¶] They took so much time to find out what kinds of experiences you've had, because they know that you'll bring those things with you to the jury box. You'll listen to the evidence."

At the recess which followed, defense counsel objected to the italicized remarks of the prosecutor and moved for a mistrial, calling the court's attention to the opinion in *People* v. *Garcia* (1984) 160 Cal.App.3d 82 [206 Cal.Rptr. 468]. Convinced that *Garcia* did preclude consideration by the jury of Prince's nontestimonial conduct in the courtroom, the court

promptly admonished the jury not to consider her conduct in the courtroom as evidence.[2] Later, in its final instructions to the jury, the court reiterated that "courtroom behavior of the defendant in this case is not evidence, and thus not a matter you may consider as evidence of competency or incompetency."

In *Garcia,* a juror complained to the judge that the defendant was "jeering or making facial motions of jest . . ." to someone in the audience while a witness was giving testimony. The court held that the trial court was correct when it, in effect, told the jurors that the conduct was not evidentiary and should be disregarded. The court noted that, as a practical matter, the court cannot control the way jurors perceive and evaluate defendants. However, "the nontestimonial behavior of a defendant while in the courtroom cannot be judicially endorsed as *evidence of his guilt.*" (*People* v. *Garcia, supra,* 160 Cal.App.3d at p. 92, italics added.)

The court distinguished use of a defendant's courtroom conduct as evidence of guilt, from observations of a defendant which are evidentiary in nature. The court said: "It should not be inferred from this analysis that we somehow disapprove of the routine practice of a jury viewing the defendant's physical appearance to see if it *comports* with a physical description given by a witness or to determine if the physical appearance of a defendant supports a factual finding that must be made by the trier of fact. (See, e.g., *People* v. *Montalvo* (1971) 4 Cal.3d 328, 335 [93 Cal.Rptr. 581, 482 P.2d 205, 49 A.L.R.3d 518] . . . [view of defendant by the trier of fact in an appropriate case may be sufficient to support a finding that defendant is an adult].) Our holding is limited to those instances where defendant's nontestimonial behavior at counsel table is not objectively relevant to any disputed issue at trial and is merely offered to show defendant's character or a trait of his character." (160 Cal.App.3d at p. 91, fn. 7, italics added.)    ▪ Unlike the situation before the court in *Garcia,* Prince's guilt or innocence was not an issue at the competency trial; "the sole purpose of the section 1368 hearing is to determine defendant's competence, not his guilt." (*People* v. *Samuel* (1981) 29 Cal.3d 489, 496 [174 Cal.Rptr. 684, 629 P.2d 485].) The only issue is whether, as a result of mental disorder, the defendant is unable

---

[2] In part, the court admonished the jury: "Now, yesterday at the conclusion of the day, or towards the close of the day, a comment was made asking you to consider your observations of extrajudicial actions of the defendant and interactions of the defendant with her counsel and her conduct in the courtroom. This is not testimony, and you may not consider it as evidence. I'm not sure that my comment in response to Mr. Jenkins' inquiry was clear. And I want to make it clear now. [¶] The nontestimonial behavior of a defendant while in the courtroom cannot be judicially endorsed as evidence. So the demeanor of the defendant in the courtroom is not relevant in this case. [ ] [¶] Okay. So to make it very clear, you're not to consider the demeanor of the defendant in the courtroom in any way, because it is not testimony; it is not evidence. Okay? Is that clear to everybody?"

to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. (§ 1367.) In a competency trial, how the defendant behaves with her attorney and with the court is evidence objectively relevant to the disputed issue at trial.

Evidence is "testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." (Evid. Code, § 140.) ▮ Obviously, if a defendant in a competency trial acts in a bizarre manner or is hallucinating, the jury will view the defendant's conduct to see if it *comports* with the opinion testimony and therefore is relevant evidence of incompetence. On the other hand, if a defendant takes notes and engages in appropriate interactions with her attorney during the proceedings, this behavior is likewise objectively relevant to competency to stand trial. We believe Prince's nontestimonial behavior at counsel table was objectively relevant to the disputed issue of competence; it is not misconduct for the prosecutor to ask the jurors to use their senses to observe Prince's conduct throughout the proceedings. The trial judge's admonition was not necessary, and since the admonition inured to the benefit of the defendant, it was not harmful.

Prince's reliance upon *People* v. *Samuel, supra,* is also misplaced. The court in *Samuel* stated only that where massive amounts of expert psychiatric testimony unanimously found Samuel incompetent, "[e]vidence that a defendant can obediently walk into the courtroom and sit quietly during the trial does not constitute substantial proof of competence . . . ." (*People* v. *Samuel, supra,* 29 Cal.3d at p. 503.) *Samuel* did not hold that the defendant's courtroom behavior could not be considered at all, only that it did not rise to the level of substantial proof of competence in light of the other evidence before the court. In fact, the court in *Samuel* cited with approval *People* v. *Pennington* (1967) 66 Cal.2d 508, 512-516 [58 Cal.Rptr. 374, 426 P.2d 942], in which the defendant's courtroom "fit of 'psychotic furor' " (*id.* at p. 512) and other courtroom outbursts were considered on the issue of competence.

▮ As to the second claim of error, Prince contends that the court's refusal to either exclude or to limit the testimony of psychiatrist Lee Coleman in the competency trial constituted prejudicial error.

The prosecution established that for the past 14 years Dr. Coleman had been examining the issue of the reliability of the tools and methods used by psychiatrists in trying to form legal opinions as to someone's competence to stand trial. The trial court thereupon found Coleman qualified to testify as an expert in that area, noting that "[t]he weight of the evidence, of course, is to be tested by the jurors themselves at a later time."

Over defense objection, Coleman was permitted to testify that the track record of psychiatrists' and psychologists' ability to diagnose whether somebody is competent or insane is "terrible" and that opinions offered by psychiatrists on the issue of a defendant's competence to stand trial "do not deserve any real credibility or any weight, because in my opinion psychiatrists don't have methods that are really unavailable to lay people."

Coleman was then permitted to evaluate the reports written by Dr. Missett in support of his opinion that Prince was presently not competent to stand trial. He found those portions of the reports dealing with Prince's past psychiatric and personal history to be irrelevant to the issue of present competency to stand trial. He similarly found the portion of Missett's reports dealing with Prince's dissatisfaction with her attorney irrelevant to the issue whether she was competent to assist counsel in a rational manner. He dismissed Missett's explanation of Prince's symptoms as "too nonspecific" and his diagnosis of her disorder as "an example of confusing people with a lot of fancy labels which even psychiatrists could never agree upon." In support of his position that psychiatric labels are often unreliable, Coleman described a study by Dr. Rosenhahn which concluded that once an initial diagnosis of psychosis was made, psychiatrists became "so locked into the label that they were simply unable to see that the person was not showing any evidence of a mental disorder." Coleman criticized the competency screening test used by Missett in evaluating Prince's competency, testifying that the results tell more about the person interpreting the answers than about the person being tested. He asserted that an opinion as to competence based upon a psychiatrist's observations of a person in jail has no more validity, and should be accorded no more weight, than a lay person's opinion as to competence based upon the same observations. He explained that detention officers in the jail would be able to observe psychotic behavior in the jail as well as a psychiatrist or anyone else because psychosis is simply a fancy word for "irrational" or "crazy" or "mad."

Coleman concluded that "the psychiatric testimony doesn't deserve any weight or any credibility" and that the jury should base its decision as to Prince's competency upon "[e]verything else they've heard in the case, minus all the psychiatric testimony and psychological testimony."

Prince's contention that the above evidence was irrelevant is without merit.

The effect of the court's ruling was to allow Dr. Coleman to express an opinion that the information available to Dr. Missett was insufficient upon which to base a valid professional opinion as to Prince's competency.

The jury is permitted to consider the credibility of the expert witnesses, the reasons given for their opinions, and the facts and other matters upon which their opinions are based, in determining what weight, if any, to give such opinion. (See CALJIC No. 2.80.) Dr. Coleman's testimony was relevant to the issues of weight and credibility of the expert testimony before the jury. (See Evid. Code, §§ 210, 406, 801, subd. (a); see *People* v. *McDonald* (1984) 37 Cal.3d 351, 369 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].)

McDonald was convicted of murder with special circumstance based on positive identification of seven eyewitnesses. The defense offered a well-qualified psychologist to testify to factors adversely affecting the reliability of eyewitness identification. The defendant offered the testimony as an aid to the jurors in weighing the eyewitness identification. (*People* v. *McDonald, supra,* 37 Cal.3d at p. 362.) The trial court excluded the evidence on the ground that the opinion of the psychologist would be invading the province of the jury. (*Id.* at p. 363.) The Supreme Court observed: "A traditional way of bringing scientific information to the attention of the judicial system, of course, is by the testimony of expert witnesses." (*Id.* at p. 365.) The court held that the offered testimony fell well within the broad statutory description of any matter that has a tendency in reason to bear on the credibility of a witness (Evid. Code, § 780), and was sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. (*Id.* at pp. 366-367.)

■■■■ It is interesting that the Supreme Court states they have never applied the so-called *Kelly-Frye* rule[3] to expert medical testimony "even when the witness is a psychiatrist and the subject matter is as *esoteric* as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness . . . . Indeed, it would be ironic to exclude such testimony on *Kelly-Frye* grounds on the theory that jurors tend to be unduly impressed by it, when jurors are far more likely to be unduly impressed by the eyewitness testimony itself." (37 Cal.3d at p. 373.) ■■ Similarly, in the present case, the qualified expert opinion of Dr. Coleman serves to prevent the jurors from being unduly impressed by *esoteric* psychiatric opinion.

The trial court properly responded to Prince's Evidence Code section 352 objection to the testimony of Dr. Coleman. The trial court ruled that Coleman "could testify that the information that is available to the two alienists

---

[3] Evidence based on a new scientific method of proof is admissible only on a showing that the procedure has been generally accepted as reliable in the scientific community in which it developed. (*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 54 App.D.C.46 [293 Fed. 1013, 34 A.L.R. 145].)

that have been appointed would be insufficient on which to find an opinion as to competency or incompetency. And I certainly think that the test of that type of opinion or the manner to test that type of opinion is not by a judge or a motion, but by cross-examination and a test in the marketplace of the peers. So that's a basis on which I will overrule the motion."

The court's remarks are an implied finding that the evidence was highly relevant, probative, and without prejudice. The expert opinion testimony of Dr. Coleman was probative to the issue of weight and reliability of the expert opinions rendered as to Prince's competence; it was not confusing, cumulative, or overly time-consuming. The court did not abuse its discretion in admitting it. (*People* v. *Cole* (1956) 47 Cal.2d 99, 105 [301 P.2d 854, 56 A.L.R.2d 1435].)

DISCUSSION OF THE CLAIMED ERROR IN THE GUILT TRIAL*

. . . . . . . . . . . . . . . . . . . .

The order suspending criminal proceedings and the commitment of Prince to Patton State Hospital is affirmed. The conviction of arson of an inhabited structure (Pen. Code, § 451, subd. (b)), the lesser of the two arson convictions, is reversed. The matter is remanded to the trial court to correct its record of convictions. Since Prince has not been sentenced, it does not appear necessary that she be returned to court pursuant to this decision.

Brauer, Acting P. J., and Capaccioli, J., concurred.

---

* See footnote, *ante,* page 848.