Filed 4/30/21  P. v. Luna CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046672 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1886625) |
| v. | |
| AMADO JUAN LUNA, et al., | |
| Defendants and Appellants. | |

Defendant Amado Juan Luna was convicted by jury trial of second degree burglary (Pen. Code, § 460, subd. (b)),[1] second degree robbery (§ 212.5, subd. (c)), and shooting at an inhabited dwelling (§ 246).  Defendant Ruben Maciel pleaded no contest to unlawfully possessing a firearm (§ 29800, subd. (a)(1)) and unlawfully possessing ammunition (§ 30305, subd. (a)(1)), and was convicted by jury trial of shooting at an inhabited dwelling (§ 246).  The trial court sentenced Luna to a total prison term of 9 years 8 months, and Maciel to a total prison term of 12 years 4 months.

Three issues are raised on appeal:  (1) Luna and Maciel challenge the sufficiency of the evidence to support their convictions for shooting at an inhabited dwelling; (2) Luna and Maciel contend, and the Attorney General concedes, that the judgment should be modified to strike their prior prison term enhancements; and (3) Maciel argues, and the Attorney General concedes, that he is entitled to additional presentence custody credit.  We reject their challenges to the sufficiency of the evidence.  However, we agree

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

with the sentencing claims. Accordingly, we strike the prior prison term enhancements, modify Maciel's presentence custody credits, and affirm the judgment as modified.

## I.  THE PROSECUTION'S CASE

### A.  *Josmarc Burglary*

On January 13, 2018, the owner of Josmarc, a jewelry store in San Jose, discovered, when he opened the store in the morning, that his store had been burglarized. The padlocks to the inside gate had been cut, and the glass door was cracked. Merchandise worth about $7,000 was missing. Surveillance cameras inside and outside the jewelry store recorded video of the burglary, and the videos were shown to the jury. Surveillance video from inside the store showed a man taking watches, silver, and gold from the display cases. Video from outside the store showed a vehicle, and then later a man who was "tamper[ing]" with the door and another man with bolt cutters. The vehicle shown on the video was a gray or silver sedan with 10-spoke shiny rims.

### B.  *Mi Lindo Michoacan Robbery*

Jazmin Ruiz was working at Mi Lindo Michoacan restaurant in San Jose on the evening of January 15, 2018. Two men entered and asked for soft drinks. After Ruiz returned with the drinks, one of the men pulled out a handgun, pointed it at Ruiz, and told her to open the cash register and give him the money. Ruiz did so. At the same time, the man reached into the cash register and took more money. The other man was holding a backpack and did not speak. Ruiz asked the man with the gun to leave some money so that she could buy food for her children, and to return the credit card receipts he had taken. The man complied. The men then ran from the restaurant. At trial, the prosecution played for the jury two surveillance videos recorded from outside the restaurant. One showed the two men interacting with Ruiz. The other showed the men exiting the restaurant and running away.

## C.      *Tradewinds Shooting*

The prosecution's theory of the case was that Luna was the shooter and Maciel aided and abetted him.

### 1.      *The Event*

On January 21, 2018, at "around 10:00 [a.m.] or so," a resident at the Tradewinds apartment complex in San Jose was near a window when he heard the pump of a shotgun. He called the police, looked outside, and saw a person with a shotgun get out of a vehicle and run towards an alleyway in the apartment complex. Moments later, the resident heard three shots, and then saw a person "r[u]n back out, and then the vehicle took off." The resident went to check on the condition of the people in the apartment that was shot. He found "a big hole" in a window that was consistent with shotgun damage. The people inside "were kind of yelling and screaming," but were unharmed. The first 911 call was made at 10:38 a.m. After the police arrived, the resident provided video from his surveillance cameras, which had captured video of the vehicle and people involved in the shooting. Three surveillance videos were played for the jury.

The videos showed a gray or silver sedan stop in a driveway next to the Tradewinds apartment complex. The sedan had black license plates with white letters, 10-spoke shiny rims, and tinted windows. A man in a gray hooded sweatshirt with white sleeves got out of the passenger side of the vehicle and walked away. The passenger returned to the car, stood next to the driver's door, talked to the driver, and then returned to the passenger seat. As the passenger returned to the vehicle, a black Oakland A's hat with a white logo was visible on his head. Eventually, both men exited the vehicle. The driver donned the passenger's gray-and-white hooded sweatshirt. The passenger then entered the driver's seat. The driver walked toward the apartment complex, returned to the vehicle, and entered the front passenger seat. After a few moments, the initial driver exited the front passenger seat carrying a shotgun, racked it, and ran toward the

3

apartment complex. Three gunshots were audible before the initial driver ran back to the car holding a shotgun. After he entered the car, it sped away.

### 2. Luna's Lexus

After the shooting, an all-points-bulletin was issued for "a 2000s gray or silver Lexus, four-door, tinted windows, large chrome or alloy spoke rims, and . . . black paper plates with white writing." San Jose Police Officer Daren Reinke was on patrol at around 1:00 a.m. on January 22, 2018 when he noticed a vehicle matching that description. Luna was driving the vehicle with a female passenger. Officer Reinke stopped the vehicle, detained both occupants, and photographed the contents of the vehicle. The photographs were shown to the jury. They showed that the vehicle had black temporary license plates on the front and back, with white lettering of the name of a car dealership, "CARTIME." The rims were 10-spoke shiny rims with the letters "CVZV" in the middle. Inside the vehicle, Officer Reinke located a "white-and-gray zip-up hoodie," photographs of which were also shown to the jury. The photographs showed a gray hooded sweatshirt with white sleeves. Photographs were taken of Luna, which showed he had a goatee, short buzzed hair, and tattoos of cursive letters on his face and neck. Luna and the passenger were ultimately allowed to leave with the vehicle, and none of the items catalogued were seized.

### 3. Maciel's Arrest

On March 13, 2018, San Jose Police officers arrived at Maciel's residence, which he shared with others, to execute an arrest and search warrant. Maciel was arrested and two cell phones were found on him. Officers located and seized an Oakland A's hat on a chair in the front porch area. While traditionally the Oakland A's colors are "[g]reen and yellow," this hat was "primarily black with the A and apostrophe and S [logo] in white." Officers also found a "primarily gray-and-white sweater" in the upstairs closet. Photographs taken of the sweatshirt showed that it was a gray hooded zip-up sweatshirt with white sleeves.

4

### 4. Cellphone Evidence

In response to a search warrant, T-Mobile provided investigators with the subscriber information and call detail records for Maciel's phone number. The records included information identifying which tower was used to make a call.

District Attorney Investigator Jeff Nichols analyzed the cellphone data using CellHawk, a software program that produces a map of cell towers used during a phone call. By default, for urban environments, the program is set to produce maps that show only that a cellphone was used within a one-mile radius of the tower. Nichols explained that in densely populated urban environments, where there is overlapping cell tower coverage, a cellphone call is "most likely" going to connect to the closet tower. Only if the tower is "overloaded, which does not happen unless there's a catastrophe," will a call generally not connect to the closest tower. Thus, since cell data is able to identify which tower handled a call, the range of where the cell phone was physically located can be approximated. On cross examination, Nichols allowed that in some circumstances a call may connect to a farther tower when there is a physical obstruction that blocks the signal.

Nichols testified about the CellHawk analysis performed on call records from January 21, 2018, from roughly 8:39 a.m. to 11:45 a.m. Nichols mapped the call detail records to create a map of Maciel's travel during that time period. At 8:39 a.m., Maciel made a call that connected to a tower one mile north of his residence. At 8:52 a.m., an incoming call to Maciel's phone connected to a tower just east of his residence. Three outgoing calls were made at 9:11 a.m., 9:27 a.m., and 9:31 a.m., using the same tower north of Maciel's residence. An outgoing call at 9:33 a.m. connected to a cell tower south of his residence. At 9:38 a.m., an incoming call connected to a cell tower "south along the side of [Highway] 101," near Yerba Buena, Monterey Road, Highway 85, and Highway 101. Nichols confirmed that if a person wanted to travel from Maciel's residence to the Tradewinds apartment complex, they would take Highway 101.

Two calls at 9:42 a.m. and 9:53 a.m. connected to a tower near Blossom Hill Road, southwest of Monterey Road. Next, a total of four calls were made in close sequence to one another, between 10:03 a.m. and 10:04 a.m., connecting to a tower "off of Blossom Hill Road . . . just east of Snell Avenue in San Jose," which was "very close" to the Tradewinds apartment complex. After the last 10:04 a.m. call, there was no cell phone activity for approximately 40 minutes. Between 10:41 a.m. and 10:44 a.m., three short calls were made. At 10:56 a.m., an outgoing call connected to a tower in the area of Maciel's residence. Additional calls in the same area were made over the course of the next hour.

Nichols calculated that if a person departed Maciel's residence at 9:30 a.m. on January 21, it would typically take "anywhere from 9 to 14 minutes" to travel the 5.3 miles between the residence and the Tradewinds apartment complex. Nichols calculated that the return trip would taken between 10 and 16 minutes depending on which route was chosen.

Call detail records reflected that on January 21, Maciel's phone connected with a San Jose area code phone number ending in 2163 a total of eight times. The last call between Maciel's phone and the San Jose number ending in 2163 occurred at 10:04 a.m.

Photographic evidence was also seized from Maciel's cell phone. Two photographs taken on January 23, 2018, showed Luna and Maciel together, standing side by side.

5. *Vehicle Evidence*

Aaron Hensley purchased a silver Lexus sedan on January 22, 2018, from a man whom Hensley identified as Alejandro Barajas. He provided the phone number of the person who sold him the vehicle as a San Jose area code number ending in 2163. Hensley described Barajas as a "young Hispanic guy, early 20s, had a tattoo on his face that was cursive . . . and a tattoo on his neck." When police photographed the vehicle, there were black paper plates with "CARTIME" in white letters on the front of the

6

vehicle.  Hensley did not recall at trial if there were paper license plates on the rear of the vehicle.  When he initially spoke with police officers, he said that the rear plate was covered with a paper license plate that matched the front paper plate.  At trial, Hensley denied that the person who sold him the car was in the courtroom.  Hensley admitted that he was under the influence of methamphetamine and "there was a lot going on" at the time he purchased the Lexus.  He believed he got a "really good deal" on the car because he felt "like the car was worth more" than he paid.  The jury was shown photographs of Hensley's vehicle.  The photographs showed a gray or silver Lexus sedan with tinted windows and 10-spoke shiny rims with the letters "CVZV" in the middle of the rims.

## II.    DEFENSE CASE

Luna and Maciel did not present any witnesses or evidence.  During closing arguments, Luna and Maciel argued that the evidence linking them to the Tradewinds shooting was circumstantial and inconclusive, and ultimately there were other reasonable explanations for the evidence.

## III.    DISCUSSION

### A.    Sufficiency of the Evidence

Luna and Maciel contend that there was insufficient evidence to support their convictions for shooting at an inhabited dwelling.  They challenge the sufficiency of the evidence establishing that they were the two perpetrators of the Tradewinds shooting.[2]

Our standard of review is well established.  "We ' "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citations.]  We presume ' "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]  This standard applies

---

[2] Luna does not challenge the sufficiency of the evidence to support his convictions for the burglary and the robbery.

whether direct or circumstantial evidence is involved.' [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1251.)

"The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)

### 1. Luna

Here, there was substantial evidence to support a finding that Luna was guilty of shooting at an inhabited dwelling. Surveillance video showed that a silver or gray Lexus sedan with tinted windows, 10-spoke shiny rims, and black license plates was the vehicle used by the perpetrators of the shooting. A little over 14 hours after the shooting, Luna was stopped in an identical silver or gray Lexus sedan, with the same distinctive features as the one involved in the shooting. Photographs of Luna taken at the stop show that he had tattoos with cursive letters on his face and neck. Later that same day, the Lexus was quickly sold to Hensley by an individual with a "cursive" face tattoo. The individual selling the Lexus had the same phone number as the person with whom Maciel repeatedly communicated prior to the Tradewinds shooting. The evidence thus supported an inference that Luna, having been caught in the Lexus sedan by police, attempted to dispose of evidence connecting him to the shooting. (*People v. Cooper* (1991) 53 Cal.3d 771, 833 [defendants' destruction of physical evidence supported reasonable inference of consciousness of guilt]; *People v. Thornton* (2007) 41 Cal.4th 391, 438-439 [evidence suggesting consciousness of guilt "may be evidence tending to prove, in light of all the

evidence the trier of fact hears, that a criminal defendant knew he or she committed a crime"].)

In addition, surveillance video from the Tradewinds shooting provided substantial evidence of Luna's involvement.  The surveillance video showed the initial driver (and later shooter) get out of the vehicle and switched places with the initial passenger.  In the video, the initial driver/shooter is clearly shorter than the passenger.  The jury was shown photographs, from Maciel's phone, of Luna and Maciel standing next to one another.  In the photographs, Luna is clearly shorter than Maciel.  The surveillance video also showed that the initial driver and shooter wore a gray-and-white sweatshirt, which was identical to the gray-and-white sweatshirt found in Luna's vehicle the next day.

Further, the evidence of extensive communication between Luna and Maciel on the day of the shooting was also substantial evidence of Luna's involvement in the offense.  Hensley provided police with a San Jose area code cellphone number ending in 2163 as the number of the person who sold him the Lexus sedan.  Maciel's cell data records reflected incoming and outgoing calls to the number ending in 2163 prior to the shooting, with the last call at around 10:04 a.m.  Thus, the jury could reasonably infer that Luna and Maciel were coordinating the shooting.  The evidence also supported an inference that the call activity between Luna and Maciel ceased at 10:04 a.m. because Maciel and Luna were by that point in the same car together.

Finally, the jury saw the surveillance video of the Tradewinds shooting, and were able to compare the shooter's physical appearance to their personal observations of Luna's physical appearance, as well as photographs taken of Luna at the traffic stop after the shooting.  (*People v. Prince* (1988) 203 Cal.App.3d 848, 855 [describing as " 'routine' " the " 'practice of a jury viewing the defendant's physical appearance to see if it comports with a physical description given by a witness or to determine if the physical appearance of a defendant supports a factual finding that must be made by the trier of fact' "], italics omitted.)

Based on the foregoing, we conclude that there was substantial evidence from which the fact finder could reasonably find that Luna was guilty of shooting at an inhabited dwelling.

2. *Maciel*

In this case, there was also substantial evidence to support the finding that Maciel aided and abetted the shooting of an inhabited dwelling. The surveillance video from the shooting showed that the initial passenger was wearing a black Oakland A's cap with a white logo, and a gray hooded sweatshirt with white sleeves. The surveillance video was taken in broad daylight, and as discussed, included a portion when both perpetrators were standing next to each other. The jury saw several photographs of Maciel alone and Maciel standing next to Luna from around the time of the shooting. Thus, the jury could compare Maciel's physical appearance, both individually and relative to Luna, to the person in the surveillance video from the Tradewinds shooting and reasonably conclude that they were the same person.

In addition, physical evidence linked Maciel to the shooting. During the traffic stop of Luna's Lexus, Officer Reinke found a gray hooded sweatshirt with white sleeves. Approximately two months after the shooting, police arrested Maciel at his residence, conducted a search, and found a black Oakland A's cap with a white logo and a gray hooded sweatshirt with white sleeves. The jury could reasonably infer that the black Oakland A's cap was the same one seen in the Tradewinds shooting surveillance video. The jury also could reasonably infer that the sweatshirt was the same one found in Luna's Lexus, and that Luna returned the sweatshirt to Maciel after he sold his vehicle to Hensley.

The call detail records from Maciel's cellphone number also placed Maciel at the scene of the crime. The evidence established that Maciel made and received a number of phone calls before and after the shooting. Between 8:39 a.m. and 9:33 a.m., Maciel's cellphone connected to towers within a mile of his residence. At 9:38 a.m., his cellphone

10

connected to a tower near Highway 101 and Highway 85. Between 10:03 a.m. and 10:04 a.m., a series of calls connected to a tower near Tradewinds Drive. After 10:04 a.m., there was an approximately 40-minute gap of no cell activity. Based on the 911 call records, the shooting occurred at around 10:38 a.m. At around 10:56 a.m., Maciel's cellphone began connecting to towers near his residence again. The distance between Maciel's residence and the Tradewinds apartments could be travelled in 9 to 16 minutes. Thus, the evidence supported the reasonable inference that Maciel travelled from his residence to the Tradewinds apartments, that he was at the Tradewinds apartments to assist Luna with committing the shooting, and that he returned to his residence immediately after the shooting.

Finally, the jury could also reasonably conclude from the call records that Maciel coordinated the shooting with Luna. The call detail records showed numerous phone calls between Maciel and Luna immediately prior to the shooting. In conjunction with the photographs of Maciel and Luna together, which suggested a close friendship, the call detail records allowed the jury to reasonably conclude that Maciel and Luna coordinated the shooting and that the back-and-forth calls between Maciel and Luna stopped because they were in the same car together.

Viewing the whole record in the light most favorable to the verdict, the evidence was sufficient to support Maciel's conviction for shooting into an inhabited dwelling as an aider and abettor.

### B.      *Prior Prison Term Enhancement*

At a bifurcated court trial, the trial court found true four prior prison term enhancement allegations as to Luna. At sentencing, the trial court struck three of the prior prison term enhancements under former section 1385, subdivision (c)(1), and imposed a one-year term for the remaining enhancement. Maciel admitted a prior prison term enhancement allegation. At sentencing, the trial court struck the prior prison term enhancement as to Maciel.

11

Luna and Maciel argue that in light of Senate Bill No. 136 (Reg. Sess. 2019-2020) (Senate Bill 136) (Stats. 2019, ch. 590, § 1), their prior prison term enhancements should be stricken.  Maciel also contends that the abstract of judgment is erroneous because it states that the enhancement was "stayed" instead of "stricken."  The Attorney General agrees that Senate Bill 136 applies retroactively to Luna and Maciel, and that the prior prison term enhancements should be stricken.

Effective January 1, 2020, Senate Bill 136 amended section 667.5, subdivision (b) to limit the one-year enhancement for prior prison terms so that it will apply only where the offense underlying the prior prison term was a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b).  (Stats. 2019, ch. 590, § 1; § 667.5, subd. (b).)

Under *In re Estrada* (1965) 63 Cal.2d 740, "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date.  [Citation.]" (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.)  "The rule in *Estrada* has been applied to statutes governing penalty enhancements, as well as to statutes governing substantive offenses.  [Citations.]"  (*People v. Nasalga* (1996) 12 Cal.4th 784, 792-793.) We find nothing in Senate Bill 136 that suggests a legislative intent that the amendments to section 667.5, subdivision (b) apply only prospectively.  Therefore, it is appropriate to infer, as a matter of statutory construction, that the Legislature intended it to apply to all cases to which it could constitutionally be applied.  (*People v. Conley* (2016) 63 Cal.4th 646, 657 ["The *Estrada* rule rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not"].)

Here, Luna and Maciel's cases were not final on January 1, 2020. (*People v. Vieira* (2005) 35 Cal.4th 264, 306.) The record reflects that Luna's prior prison terms were for vehicle theft , and Maciel's prior prison term was for assault with force likely to cause great bodily injury with a gang enhancement. Because the prior prison terms were not served for a sexually violent offense, Luna and Maciel's section 667.5, subdivision (b) enhancements are now unauthorized under the amended statute. "When sentencing error does not require additional evidence, further fact finding, or further exercise of discretion, the appellate court may modify the judgment appropriately and affirm it as modified. [Citations.]" (*People v. Haskin* (1992) 4 Cal.App.4th 1434, 1441.) Given that the sentencing error in the present case does not require further fact finding or the further exercise of discretion by the trial court, we will modify the judgment to strike the prior prison term enhancements and affirm the judgment as modified.[3]

### C.    *Custody Credit*

Maciel contends that the trial court erred by awarding him only 529 days of presentence custody credit. He argues that he is entitled to a total of 621 days of presentence custody credit, comprised of 311 actual days of custody credit and 310 days of conduct credit. The Attorney General concedes this point.

Section 4019 provides that a person confined prior to sentencing may earn two days of conduct credit for every two days served. (*People v. McKenzie* (2018) 25 Cal.App.5th 1207, 1212.) "A defendant who serves an odd number of days is not entitled to an additional single day of conduct credit for his or her final day of actual custody." (*People v. Whitaker* (2015) 238 Cal.App.4th 1354, 1358.) Here, Maciel was arrested on March 13, 2018. He was in local custody until he was sentenced on January 17, 2019.

---

[3] In addition, as noted, although the abstract of judgment states that Maciel's prior prison term enhancement was stayed, the record reflects that the trial court struck the enhancement. We need not address this issue because Maciel's abstract of judgment will be modified to strike the enhancement.

Thus, Maciel was in actual custody for 311 days, which resulted in 310 days of conduct credit. Accordingly, Maciel is entitled to a total of 621 days of presentence credit.

## IV. DISPOSITION

The judgments are modified to (1) strike the prior prison term enhancements as to Luna and Maciel and (2) award Maciel 92 additional days of presentence custody credit for a total of 621 days. The trial court is directed to prepare amended abstracts of judgment reflecting these changes and to forward certified copies of the amended abstracts to the California Department of Corrections and Rehabilitation. As modified, the judgments are affirmed.

                            _____

                            ELIA, ACTING P.J.

WE CONCUR:

_____

GROVER, J.

_____

DANNER, J.

*People v. Luna et al.*
H046672