Filed 11/22/22 P. v. Washington CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079609 |
| v. | (Super.Ct.No. RIF1303885) |
| JONATHON EDWARD WASHINGTON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Jeffrey Prevost, Judge. Affirmed.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

In 2015, defendant Jonathan Washington was convicted by a jury of multiple counts of armed robbery and other offenses, for which he was sentenced to an aggregate term of 17 years 4 months. In 2022, defendant filed a motion to reconsider his sentence in light of the enactments of Senate Bill 81 (Stats. 2021, ch. 721, §1) and Assembly Bill 124. (Stats. 2021, ch.695, § 5.) The trial court denied the request and defendant appealed.

We appointed counsel to represent defendant on appeal, and counsel filed an opening brief raising no arguable issues. (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*); *Anders v. California* (1967) 386 U.S. 738 (*Anders*).) Defendant was invited to submit a supplemental brief on his own behalf, and did so, challenging the trial court's denial of his motion for reconsideration of his sentence. We affirm.

**BACKGROUND**

The facts of the offense are taken from our opinion on direct appeal in *People v. Washington,* E062698 (August 5, 2016, nonpub. opn.), supplementing where needed with current information.

A. The First Robbery

At around 9:30 p.m. on November 29, 2013, defendant and another man entered Goody's Food Store in Riverside wearing masks and gloves. One was wearing a "skeleton mask" and the other was wearing a black mask.[1] Their faces were mostly

---

[1] Although one witness identified the second mask as "red", the other witnesses called it "black," as confirmed by a review of surveillance footage. The evidence supported the identification of defendant as the black-masked robber, as explained below.

covered. Two customers, Justin and James Foster,[2] storeowner Kahlid Ramahi, and employee Jose Cruz were in the store at the time.

The black-masked robber pointed a gun at Justin and told him to get on the floor. Both Justin and James were scared and got on the floor. Justin gave the robber a money clip and James gave him his wallet. Justin only saw one robber, but James saw two.

The skeleton-masked robber then pushed Ramahi to the cash register and told Ramahi to give him all the money in it. Ramahi gave him approximately $300. He was scared. Although Ramahi did not see the skeleton-masked robber holding a gun at the time, when he later reviewed surveillance footage, he saw that the skeleton-masked robber had held a gun to him. James saw one of the robbers point a gun at Ramahi, but did not remember which one.

While Ramahi was being robbed, store employee Cruz walked into the store from a back room. Cruz saw the skeleton-masked robber holding a gun at Ramahi. While Cruz was watching Ramahi, the black-masked robber came up to Cruz and demanded his wallet. Cruz had not realized that there was a second robber until that moment. Cruz said that he did not have a wallet and the black-masked robber took a gun out of his waistband and put it to Cruz's temple. He frisked Cruz and found Cruz's wallet and cell phone, both of which he took. Cruz had $600 in his wallet. Cruz complied with the robber's demand for him to lie down on the floor because he "had no other option." Both robbers ran out of the store and Ramahi called the police.

_____

[2] To avoid confusion we will refer to Justin and James Foster by their first names.

3

The jury watched a surveillance video recording of the robbery. The responding officer testified as to his interpretation of the events recorded on the video. It appeared to the officer that the same robber who initially held a gun to Ramahi also forced Cruz to the ground. Cruz testified that in the surveillance video "you're unable to see everything very well."

B. The Second Robbery

At around 9:45 p.m. that same night, the two robbers entered Palm Liquor, approximately one mile away from the first location. The black-masked man held a gun to cashier Yadwinder Singh's head and ordered him to open the cash register, which he did. The second robber took approximately $250 in cash from the register and searched Singh's pockets. He found an ammunition magazine in Singh's pocket. The robbers told Singh that "they" would shoot him if he did not give "them" the gun to which the magazine belonged. The black-masked man took Singh's gun and handed it to the second robber, who, in turn, pocketed it. The robbers took some liquor bottles, including Patron tequila and Ciroc vodka, and left. The jury watched a surveillance video recording of the second robbery.

In the video recordings of the two robberies, and in still photographs captured from the videos, the top part of the black-masked man's face and complexion are visible

4

(including his eyes and eyebrows and part of his nose and forehead). A bump is also visible in the back of the black-masked man's hoodie.[3]

## C. Defendant's Arrest

On December 1, 2013, defendant led police on an extended chase in Long Beach during which he ran numerous stop signs and crashed into a parked car. Defendant fled on foot into an apartment complex and was found in a shed on the property. Police officers found marijuana, $454 in cash, and Cruz's cell phone in defendant's pockets. In a search of the cell phone, officers found a "selfie" of defendant and a second picture of a handgun, two magazines, a bottle of Patron tequila, a bottle of Ciroc vodka, and "a bunch of cash that was laid out almost like . . . a trophy picture." The second picture was taken at 1:56 a.m. on the morning after the robberies.

During the foot pursuit, defendant discarded a loaded handgun which was matched to the one reported stolen by Singh. In a search of defendant's car, officers found a half drunk bottle of Ciroc vodka whose serial number matched the one stolen from Palm

---

[3] In closing argument, the prosecutor compared defendant's courtroom appearance with the video and photographic evidence: "[L]ook at it closely and compare things like his eyes, eyebrows, his forehead, and then you look at how his hair must have been pulled back in there, in his hoodie, you see the lump in the back of [his] sweatshirt." Although the record does not contain an explicit description of defendant's appearance and hair at trial, he was visible to the jury and the court. (See *People v. Montalvo* (1971) 4 Cal.3d 328, 335 [jury's observation of defendant's physical courtroom appearance constitutes non-testimonial evidence]; *People v. Prince* (1988) 203 Cal.App.3d 848, 855 [describing as "'routine'" the "'practice of a jury viewing the defendant's physical appearance to see if it comports with a physical description given by a witness or to determine if the physical appearance of a defendant supports a factual finding that must be made by the trier of fact'"], italics omitted; *People v. Garcia* (1984) 160 Cal.App.3d 82, 91, fn. 7 [same].)

Liquor. They also found the ammunition magazine for Singh's gun, gloves, a flashlight, and a screwdriver.

The jury convicted defendant of five counts of robbery (Pen. Code, § 211, counts 1-5) and one count of receiving stolen property (Pen. Code, § 496; count 6). The jury also found that defendant personally used a firearm in the commission of all five robberies (Pen. Code, § 12022.53, subd. (b)). Defendant was sentenced to 17 years 4 months in state prison, consisting of three years for count 1, plus 10 years for the personal firearm enhancement, and one year for count 5, plus three years four months for the personal firearm enhancement. The court stayed sentencing on the remaining counts.

On direct appeal, we affirmed the judgment and sentence as to counts 1 through 5, but reversed count 6, the charge of receiving stolen property that had been taken during the robbery. (E062698, *supra*, p. 9.) The California Supreme Court denied review on October 21, 2016.

On June 24, 2022, the superior court received defendant's motion to reconsider his sentence based on recent amendments to Penal Code sections 1170 and 1385. The trial court denied the request. Defendant appeals.

## DISCUSSION

This court appointed counsel to represent defendant on appeal. After examining the record, counsel filed an opening brief pursuant to *Wende*, *supra*, 25 Cal.3d 436, that raises no issues and asks us to independently review the record. We invited defendant to submit a supplemental brief, which he has done, arguing that he is entitled to

6

resentencing pursuant to recent legislative amendments to Penal Code sections 1170, subdivision (b), and 1385. Defendant's arguments lack merit. Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, 124, we address the contentions raised by defendant and explain why they fail.

1.      *Assembly Bill No. 124*

Defendant argues that Assembly Bill No. 124, which amends Penal Code section 1170, requires that he be resentenced to the low term for his robbery conviction. We disagree.

Assembly Bill No. 124 (2021-2022 Reg. Sess.), requires the court to impose a lower term sentence under certain circumstances, such as if a defendant's youth—defined as being under 26 years old—contributed to the commission of the offense. (Pen. Code, §§ 1170, subd. (b)(6), as amended by Stats. 2021, ch. 695, § 5; 1016.7.) However, that amendment was not made retroactive (except where a youthful offender is sentenced to life without the possibility of parole) and does not go into effect until January 1, 2023. At that time, Penal Code section 1170, subdivision (b)(6), will permit the court, unless it finds that the aggravating circumstances outweigh the mitigating circumstances, to impose the lower term if certain contributing factors are present in the commission of the offense, such as the defendant's youth. As used in that subsection, the person is considered a youth if they are under the age of 26, as provided in Penal Code section 1016.7, subdivision (b).

7

The current text of Penal Code section 1170, subdivision (b)(1), which remains in effect until January 1, 2023, provides that when a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2).)

Here, defendant was already sentenced after committing a serious and violent felony. The provisions of Assembly Bill No. 124 do not reveal an intention to apply retroactively to sentences that are final, as defendant's sentence is. Instead, it will be applicable to defendants whose sentences are not final when the amendment becomes effective. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.) Defendant's case was final in 2016 and remains unaffected by the statutory amendments.

2. *Senate Bill No. 81*

Defendant also argues that the trial court should have reconsidered the imposition of the gun use enhancement based on legislative amendments to Penal Code section 1385. We disagree.

Senate Bill No. 81 amended Penal Code section 1385 (Stats. 2021, ch. 721, § 1). As modified by Senate Bill No. 81, Penal Code section 1385, subdivision (c) now provides, in part: "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." However, that section does not authorize a defendant to make a motion to reconsider a sentence that is final. Instead, it

8

expressly applies at or before sentencing. (See *People v. Hernandez* (2000) 22 Cal.4th 512, 522, citing *People v. Superior Court* (*Flores*) (1989) 214 Cal.App.3d 127, 136-137.)

Further, the authorization to dismiss all or a part of a "charge" logically means that after a defendant has been sentenced, the court no longer has authority to dismiss or strike a enhancement. Indeed, Penal Code section 1385, subdivision (c)(7) expressly states the subdivision shall apply to "sentencing" occurring after the effective date of the act. This means two things: (1) It applies only up to the point sentence is pronounced, and (2) it applies only to cases in which the sentencing hearing takes place after the amendment has gone into effect. Penal Code section 1385, even after the amendment, does not give the superior court authority to vacate a lawful sentence and impose a new one.

Defendant was properly sentenced to an enhancement of 10 years and his judgment became final in 2016. The trial court has long since lost jurisdiction to amend, correct, modify, or recall defendant's sentence.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

SLOUGH
J.

FIELDS
J.

9